NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 24889-87.     Filed February 28, 1989.

*George H. Gangwere, C. W. Crumpecker, Jr.,* and *Randal O. Carlson,* for the petitioner.
*Robert M. Fowler,* for the respondent.

COHEN, *Judge:* Respondent determined a deficiency of $10,395.14 in petitioner's Federal income tax for 1982. The issues for decision are (1) whether income received by petitioner in connection with the publication of commercial advertisements in game programs for the 1982 Men's Division 1 Basketball Championship Tournament was unrelated business taxable income under section 512,[1] and if so, (2) whether such income is excludable from the unrelated business income tax as a royalty under section 512(b)(2).

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner's principal place of business was located in Mission, Kansas, when the petition was filed.

Petitioner is an unincorporated association of more than 880 members consisting of colleges, universities, athletic conferences and associations, and other educational organizations. Among petitioner's stated purposes, as established by article 2, section 1(f) of petitioner's constitution, is "to supervise the conduct of * * * regional and national athletic events under the auspices of this Association." Petitioner is governed by its member institutions. To assist it in its day-to-day operations in 1982, petitioner employed a staff of 45 to 50.

Petitioner annually sponsors 76 championship games, meets, or tournaments for men or women in 21 sports, including basketball. Game programs which set forth the participants and other tournament-related information are usually published and sold in conjunction with these events. Petitioner's executive regulation 2, section 15, as published in the 1981-1982 NCAA manual, authorized the actual printing of such programs and selling of advertising therein by "an outside agency under contract, the host institution, or the NCAA national office." The regulation further stated,

---

[1] All section references are to the Internal Revenue Code as amended and in effect for the year in issue, except as otherwise noted.

"If the program is printed by an outside agency, the Association shall receive a guaranteed amount or a predetermined percentage of program receipts."

One of the largest and most celebrated championship events that petitioner sponsors is the Men's Division 1 Basketball Championship Tournament (the tournament). The tournament has been conducted annually since 1939, although sponsored by petitioner since 1940, following the conclusion of each regular season of college basketball. Petitioner's 9-member Division 1 Men's Basketball Committee supervises the event. It is an elimination tournament which begins with regional rounds played at various locations across the country and culminates with what is commonly referred to as the "Final Four Tournament"—the semifinal and final games involving the top four teams (the final four). The 1982 tournament was held on 8 separate days in March spanning approximately 3 weeks. Forty-eight college teams were invited and participated. The total revenue generated by the tournament, amounting to over $18 million in 1982, traditionally has been responsible for about 75 percent of petitioner's annual operating budget.

In a written contract dated May 18, 1981, petitioner contracted with Lexington Productions, a division of Jim Host & Associates, Inc. (Host or publisher) for the publication and sale of programs, including advertising therein, for the 1982 final four games. The written contract included the following terms:

WHEREAS, NCAA desires to arrange for the publication and sale of, and for the sale of advertising space in, its 1982 National Collegiate Basketball Championship souvenir program; and

WHEREAS, Publisher has agreed to provide said services on the terms hereinafter set forth;

NOW THEREFORE, it is AGREED as follows:

1. *Appointment and Authorization.* NCAA hereby grants to the Publisher the exclusive right to print and to publish as co-publisher with the NCAA the 1982 National Collegiate Basketball Championship Program for the semifinals and finals to be held in New Orleans, LA, on March 27 and 29, 1982, and NCAA hereby appoints Publisher as its exclusive agent for the sale of advertising to be included in said program publication. * * *

2. *Services.* The Publisher agrees to produce the program in accordance with copy submitted to Publisher by the NCAA and to deliver the agreed upon number of copies of the NCAA as hereinafter provided. Publisher

agrees further to use its best efforts to secure national and local advertising for said program. Publisher agrees to accomplish the foregoing in an efficient and workmanlike manner under the following terms:

(a) Publisher shall plan, organize and conduct an advertising sales program for the aforementioned publication.

(b) Publisher shall create and develop advertising ideas.

(c) Publisher shall bill all advertising clients, make collection on due accounts, and furnish the NCAA with a complete record of sales billed, amount collected, and amount of, and manner of computing, commissions.

(d) Publisher shall agree to pay all layout, printing, production and freight costs, and all costs and expenses incurred in the selling of the advertising.

3. *Advertising Limitations.* a) Advertising in the program shall not exceed 35% of the total pages in the program, including the cover pages. b) In making sales of advertising space, it is understood that the following advertising shall be excluded: Alcoholic beverages (except malt beverages, beer and wine as limited hereafter), cigarettes or tobacco used for purposes of smoking, political organizations (except for the offices of president and vice-president of the United States), professional sports organizations and their personnel (except as specified hereafter) and organizations or individuals promoting gambling. c) Malt beverages, beer and wine advertising may be used in game programs if consistent with the policy of the host institution, but such advertisements shall not comprise more than 14 percent of the space in the program devoted to advertising. d) Advertisements featuring active professional athletes in other sports may comprise not more than seven percent of the space in the program devoted to advertising. Parties representing the NCAA in advertising sales for game programs shall take every reasonable step to discourage the use by advertisers of active professional athletes from sports regulated by the NCAA, informing the advertisers of the NCAA's desire that such professional athletes not be used. Every potential sponsor shall be advised of the terms of this provision prior to contracting with such sponsor. Advertisements are not acceptable which contain references to or photographs of the game, personnel, broadcasts, telecasts or other activities of professional sport organizations. e) Nontherapeutic drugs and, generally, other drugs and patent medicine advertisements are excluded; however, analgesics, cold remedies, antacids, and athletic training aids which are in general use are acceptable. Institutional advertising by pharmaceutical firms also is acceptable. No advertisement may relate, directly or indirectly, the advertising company or the advertised product to the participating institutions of their athletes, or the NCAA itself unless prior written approval has been granted by the NCAA executive director. f) The NCAA reserves the right of final approval for all advertising in the aforementioned program.

\*     \*     \*     \*     \*     \*     \*

6. *Compensation and Expense*. Publisher agrees to pay to NCAA for co-publishing and advertising rights the sum of $50,000 or 51% of net revenues, whichever is greater. Net revenues shall mean gross revenues for all NCAA program sales and advertising sales less printing costs, vendor commissions, advertising commissions, sales taxes, and advertising production expense. The cost of handling and mailing of mail order sales shall be at the publisher's sole expense. Publisher shall prepare and deliver to the NCAA on or before June 1, 1982 a report, certified by a Certified Public Accountant, showing gross sales of all advertising and program sales and all deductions therefrom and net revenues as specified herein. * * * NCAA shall have the right to examine Publisher's financial records pertaining to the NCAA accounts at any time.

In addition, Host agreed to indemnify petitioner from any claims arising from contracts between Host and third parties made to effectuate the contract and any claims, liabilities, or damages arising from the preparation, presentation, or sale of the programs or the advertising contained therein.

Petitioner and Host also entered into an oral agreement whereby Host would produce a uniform program for the 1982 regional tournament rounds. The terms of the oral agreement were essentially the same as those of the written contract, including petitioner's share of income.

Only two of petitioner's staff members worked with the Division 1 Men's Basketball Committee in sponsoring and managing the 1982 tournament. Petitioner's involvement with Host was limited to recommending some story ideas about the tournament or authors to write those stories and reviewing whether a couple of proposed advertisements met the conditions of the contracts on acceptable advertisements in programs. Petitioner did not otherwise monitor the content, sale or publication of advertisements in the tournament programs. Petitioner was not consulted about sales charges for advertisements appearing in the program. Petitioner did not solicit any advertising in connection with the preparation of the program. Petitioner was not involved in the printing or distribution of programs.

Host presented a detailed financial report regarding revenue generated from the sale of programs and advertisements therein to the Division 1 Men's Basketball Committee at its July 1982 meeting, at which time petitioner was paid its share of receipts pursuant to the terms of the

written contract and oral agreement. No further audits of Host's financial records were ever performed by petitioner.

Petitioner reported no unrelated business gross income on its Federal income tax return for the fiscal year ending August 31, 1982. In his notice of deficiency, respondent determined petitioner's share of the net income from program advertising to be $55,926.71 and that such income of petitioner was taxable as unrelated business income.

## OPINION

### I

The first issue for decision is whether the amount of petitioner's receipts from Host derived from the sale of program advertising constitutes unrelated business taxable income under section 512.

Petitioner is an organization exempt from tax pursuant to section 501(c)(3). Section 511(a)(1), however, imposes a tax upon the "unrelated business taxable income" of a tax-exempt organization. Section 512(a)(1) defines unrelated business taxable income as "the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions * * * which are directly connected with the carrying on of such trade or business." Section 513(a) in turn defines "unrelated trade or business" as "any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption." Section 1.513-1(a), Income Tax Regs., concisely weaves the above-mentioned statutory sections into a three-pronged test:

unless one of the specific exceptions of section 512 or 513 is applicable, gross income of an exempt organization subject to the tax imposed by section 511 is includible in the computation of unrelated business taxable income if: (1) It is income from trade or business; (2) such trade or business is regularly carried on by the organization; and (3) the conduct of such trade or business is not substantially related (other than through the production of funds) to the organization's performance of its exempt functions.

*United States v. American College of Physicians,* 475 U.S. 834, 838-389 (1986); *West Virginia State Medical Association v. Commissioner,* 91 T.C. 651, 655 (1988), on appeal (4th Cir., Dec. 12, 1988); *Suffolk County Patrolmen's Association v. Commissioner,* 77 T.C. 1314, 1319 (1981).

These elements are in the conjunctive. Petitioner has the burden of proof as to each of the elements. Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner can avoid the tax entirely if it can show that any one of these elements is not present. *Veterans of Foreign Wars, Mich. v. Commissioner,* 89 T.C. 7, 19-20 (1987).

Under section 513(c), a "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services, and it does not lose its identity as a trade or business merely because it is carried on within a larger aggregate of similar activities. Thus, a "trade or business" includes not only a complete business enterprise, but also any component activity of a business. Section 1.513-1(b), Income Tax Regs. For purposes of applying the unrelated business taxable income rules in the context of a publishing business, this means that the "trade or business" of selling advertising space is distinct and fragmented from the perhaps tax-exempt "trade or business" of circulating the publication. *United States v. American College of Physicians,* 475 U.S. at 839; *West Virginia State Medical Association v. Commissioner,* 91 T.C. at 656-658.

In arguing that its revenues from the sale of program advertising did not constitute unrelated business taxable income, petitioner effectively concedes that the first and third elements under the three-pronged test are present in this case. Consequently, the area of controversy concerns the second element—whether petitioner "regularly carried on" such advertising activities.

Paragraph (c) of section 1.513-1, Income Tax Regs., provides guidance in deciding whether an activity is "regularly carried on" within the meaning of section 512. Subparagraph (1) sets forth the general principle that "regard must be had to the frequency and continuity with which the activities productive of the income are conducted and the manner in which they are pursued." This require-

ment must be applied in light of the purpose of the unrelated business income tax to place exempt organization business activities upon the same tax basis as the nonexempt business endeavors with which they compete.

Subparagraph (2) applies the principles of subparagraph (1) to "certain cases." "Where income producing activities are of a kind normally conducted by nonexempt commercial organizations on a year-round basis, the conduct of such activities by an exempt organization over a period of only a few weeks does not constitute the regular carrying on of trade or business." The illustration provided is the operation of a sandwich stand by a hospital auxiliary for 2 weeks at a State fair. Where income-producing activities are of a kind normally undertaken by nonexempt commercial organizations only on a seasonal basis, however, the conduct of such activities by an exempt organization during a significant portion of the season ordinarily constitutes the regular conduct of a trade or business. Thus, "the operation of a track for horse racing for several weeks of a year would be considered the regular conduct of trade or business because it is usual to carry on such business only during a particular season." Section 1.513-1(c)(2)(i), Income Tax Regs.

Subparagraph (2) further states that "intermittent activity" will not be considered regularly carried on if it is conducted without the competitive and promotional efforts typical of commercial endeavors. An example given is that "the publication of advertising in programs for sports events or music or drama performances will not ordinarily be deemed to be the regular carrying on of business." Section 1.513-1(c)(2)(ii), Income Tax Regs. Certain intermittent activities, however, occur so infrequently that neither their recurrence nor the manner of their conduct will cause them to be regarded as a regularly carried on trade or business. The annual recurrence of such activities in itself does not make the conduct regular. Section 1.513-1(c)(2)(iii), Income Tax Regs.

In *Suffolk County Patrolmen's Association v. Commissioner,* 77 T.C. 1314 (1981), we considered whether the sale of advertising space in the program guide for an exempt organization's annual fund-raising event constituted unrelated business taxable income. In that case, the organiza-

tion sponsored vaudeville shows held during 1 weekend per year for at least 6 consecutive years. The vaudeville shows were produced under contract by independent professional theatrical producers without cost to the exempt organization. The producers agreed to sell admission tickets and advertising for publication in the program guide. The organization agreed to lend its support in the sale of tickets and to provide ticket takers and ushers. Under the contracts, the organization was to receive 28 percent of gross advertising revenues and 50 percent of the ticket revenues. The producers solicited all advertising for the program guides beginning approximately 8 to 16 weeks prior to the time of the shows. The organization assumed the duties of collecting advertising revenues during 2 of the 3 years in issue. All advertising revenues were deposited into the organization's bank account and were disbursed by its treasurer at the time of the shows. The Commissioner determined that the organization's advertising revenues, as well as ticket revenues, constituted unrelated business taxable income.

In *Suffolk County Patrolmen's Association,* we held that the organization's advertising and ticket sale activities were "substantially the same as those identified in the regulations and the legislative history of sections 511 through 513 as being 'intermittent,' and not 'regularly carried on.' " 77 T.C. at 1322. In regard to whether the use of an independent commercial firm to solicit and sell program advertising and to produce the shows rendered the exempt organization's activities "regularly carried on," we stated:

It is entirely reasonable for an exempt organization to hire professionals in an effort to insure the success of a fundraiser, and there are no indications in the regulations or legislative history of sections 511 through 513 that the use of such professionals would cause an otherwise infrequent intermittent activity to be considered regularly carried on. [77 T.C. at 1323.]

Petitioner first argues that it did not regularly carry on advertising activities in connection with the publishing of the tournament programs because its role in that regard was passive. In support of this argument, petitioner asserts that Host, as "publisher," acted on its own without direction or control by petitioner, notwithstanding the

references in the written contract to petitioner as "co-publisher" and to Host as petitioner's exclusive agent for the sale of advertising to be placed in the program. Petitioner contends that "the language of the written contract as to the existence of a principal-agent relationship is contradictory, ambiguous, and inconclusive," arguing, without support in the record or citation of authority, that the indemnification clause is "contrary to general principal-agent agreements." Petitioner further contends that the facts and circumstances surrounding the written contract, and the subsequent course of dealings between Host and petitioner, negate any intent to establish a principal-agent relationship.

Petitioner next argues that sporting events such as the tournament in this case, which is held annually during 3 consecutive weekends, ordinarily are deemed intermittent and not regularly carried on under section 1.513-1(c)(2), Income Tax Regs. Petitioner finally contends that *Suffolk County Patrolmen's Association* is directly on point with the case at hand.

Respondent argues that petitioner did regularly carry on the sale of program advertising and that such activity was not intermittent. Respondent distinguishes *Suffolk County Patrolmen's Association* from this case on the ground that the cases involve two inherently different types of activities. According to respondent, a vaudeville show could be held at any time of the year on as many nights of the year as a sponsor would desire, i.e., a "year-round" activity; thus, the conduct of such shows during 1 weekend per year is relatively "occasional" and irregular. By contrast, the tournament in this case is intended to be an annual event, the climax of the college basketball season. Respondent thus urges that "since 'seasonal' events, such as racetrack seasons and sports championships, are 'normally' carried on only during part of the year or once a year, such operations would be regularly conducted even if they are only held during part of the year or once a year."

Respondent also contends that it is "myopic" to view petitioner's activities relating to this tournament in isolation, that it is one of 76 separate championships sponsored by petitioner annually, and that petitioner produces or has

produced programs for championship events in other sports. In addition, respondent contends that it is fair to analyze whether petitioner regularly carried on the sale of program advertising within the larger context of petitioner's extensive actions in planning and conducting the tournament, because there would be no program or advertising revenues therefrom without the tournament.

Finally, respondent notes that the contract placed specific limitations on Host as to the type of advertising allowable in the program and granted petitioner the right of final approval for all advertising in the program. Respondent contends that the presence of such legal rights, and not the actual exercise of them, is the critical factor in determining the level of petitioner's activity.

The parties' arguments place undue emphasis on the tournament itself as the measure for determining whether petitioner regularly carried on the business at issue. Petitioner seeks support for its position by referring to the event's short time span each year, while respondent emphasizes petitioner's extensive responsibilities in planning and managing the tournament and the event's seasonal nature. The distinct "trade or business" at issue here is the sale of program advertising, which is severed by virtue of section 513(c) from the "trade or business" of circulating the program and also from petitioner's overall activity of conducting the tournament. It is inappropriate to decide whether the trade or business at issue is regularly carried on solely by reference to the time span of the tournament itself. Although sponsorship of a college basketball tournament and attendant circulation of tournament programs are seasonal events, the "trade or business" of selling advertisements is not.

We have no doubt that in practice petitioner spent little time with respect to the sale of program advertisements; the evidence shows that Host conducted all of the sales. The pivotal question, however, is whether Host's activities should be attributed to petitioner for purposes of determining whether petitioner regularly carried on the business of selling program advertising. The nature of petitioner's relationship with Host under the contract indicates that they should be.

The written contract expressly provided that Host was petitioner's "exclusive agent for the sale of advertising to be included in said program publication." While the designation of this relationship is not controlling, it is buttressed by other language within the contract as well as by its general terms. The object of the agreement, as reflected in its preface, was Host's performance of services. Host covenanted to use its best efforts to secure national and local advertising for the program and to conduct an advertising sales program in an "efficient and workmanlike manner." In regard to the limitations on advertising, the written contract stated, "Parties *representing the NCAA* in advertising sales for game programs shall take every reasonable step to discourage the use" by certain types of advertisers. (Emphasis supplied.) Petitioner reserved the unqualified right of final approval for all advertising in the program. Host had a duty to account for all profits from its activities, and petitioner was entitled to examine Host's financial records "pertaining to *the NCAA accounts* at any time." (Emphasis supplied.) In sum, the contract manifested an intent (1) that Host would act on petitioner's behalf in conducting the sale of advertising and (2) that petitioner could control Host's activities, elements of an agency relationship. Neither the compensation structure, which shifted the risk of loss to Host, nor the presence of the indemnification clause in favor of petitioner negates this intent.

Assuming arguendo that the nature of the relationship between petitioner and Host under the written contract was ambiguous, petitioner has not proven that the parties thereto intended the relationship to be something other than an agency relationship. The minimal time petitioner devoted to the sale of advertising and the *loose control* petitioner exercised over Host's conduct—the primary extrinsic evidence relied on by petitioner—constitute conscious choices by petitioner in spite of the terms of the contract and must be afforded little weight.

Normally, we would proceed to analyze whether Host carried on the sale of advertising on petitioner's behalf regularly, for the *mere employment of an independent commercial firm does not in itself render the exempt*

organization's "trade or business" regular. *Suffolk Co. Patrolmen's Association, Inc. v. Commissioner*, 77 T.C. at 1323. Petitioner has not produced any evidence, however, regarding the extent or manner of Host's conduct in connection with the solicitation, sale, and publication of advertising for the tournament programs. No employee of Host testified. Without such evidence, petitioner has not proven that neither it nor Host carried on the activity of selling program advertising regularly. We will not assume Host's conduct in this regard was infrequent or conducted without the competitive and promotional efforts typical of other commercial endeavors. Petitioner has not shown that Host's activities qualify under section 1.513-1(c)(2)(ii), Income Tax Regs., regarding intermittent activity. We must sustain respondent's determination that petitioner's receipts from the sale of tournament program advertising constituted unrelated business taxable income.

## II

Petitioner next argues that even if its income from the sale of program advertising is held to be unrelated business taxable income, the income should nonetheless be excluded from taxation under section 512(b)(2) as a royalty. Section 512(a)(1) provides that certain "modifications" described in section 512(b) are not to be taken into account when determining an organization's unrelated business taxable income. Section 512(b)(2) includes royalties among such modifications.

Whether an item of income constitutes a royalty is to be determined from all of the facts and circumstances in each case. Sec. 1.512(b)-1, Income Tax Regs. Generally, a royalty is a payment for the use of a valuable right such as a trademark, trade name, service mark, or copyright, regardless of whether the property represented by the right is used. *Fraternal Order of Police v. Commissioner*, 87 T.C. 747, 757 (1986), affd. 833 F.2d 717 (1987). In *Disabled American Veterans v. United States*, 227 Ct. Cl. 474, 493, 650 F.2d 1178, 1189 (1981), the Court of Claims held that royalties also are payments "which constitute passive income, such as the compensation paid by a licensee to the licenser for the use of the licenser's patented invention."

650 F.2d at 1189. In *Fraternal Order of Police v. Commissioner*, 87 T.C. at 758, this Court held that the taxpayer's income from advertisements in its magazine was not royalty income since the taxpayer's role in the publication of the magazine was not passive. See also *National Water Well Association v. Commissioner*, 92 T.C. 75 (1989).

Petitioner's argument is similar to that presented on the previous issue—that its income pursuant to the written contract and oral agreement constituted passive income, in the nature of a royalty for the right to publish and sell the tournament programs, including advertising therein. Petitioner further contends that the passive nature of its income is not changed by its right under the agreement to approve the quality of all advertisements and cites Rev. Rul. 81-178, 1981-2 C.B. 135.

In Rev. Rul. 81-178, respondent addressed whether payments made to an exempt organization under a licensing agreement constituted royalties within the meaning of section 512(b)(2). In that ruling, an exempt organization negotiated licensing agreements with various businesses which authorized the latter to use the organization's trademarks, trade names, and other intangible property in the sale or promotion of merchandise or services. Under the licensing agreements, the organization retained the right to approve the quality or style of the licensed products and services sold by the businesses. The agreements also required the businesses to refrain from engaging in activity that would adversely affect the reputation of the organization. Respondent concluded that the payments constituted royalties because the payments were made for the use of valuable rights. He further ruled, "The mere retention of quality control rights by a licensor in a licensing agreement situation does not cause payments to the licensor under the agreements to lose their characterization as royalties." Rev. Rul. 81-178, 1981-2 C.B. 135, 136.

As discussed above, the evidence does not suggest that the agreements between petitioner and Host were anything other than agency agreements, and petitioner's role was thus not passive. Rev. Rul. 81-178 is merely respondent's interpretation of certain sections and regulations and is not binding upon us. In any event, the licensing agreements

described in that ruling merely authorized the businesses to use and exploit certain valuable rights, such as trademarks. By contrast, the agreement in this case imposed a duty upon Host to perform certain services on petitioner's behalf and under petitioner's control.

We conclude that petitioner's income from the sale of program advertising does not constitute a royalty under section 512(b)(2) and thus is not excludable from its unrelated business taxable income.

*Decision will be entered for the respondent.*