DISABLED AMERICAN VETERANS, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 34856-87, 37361-87.    Filed February 26, 1990.

*Bart A. Brown, Jr., Donald C. Alexander,* and *Michael Quigley,* for the petitioner.

*Genevieve K. Murtaugh* and *Reid M. Huey,* for the respondent.

WILLIAMS, *Judge:* In these consolidated cases, the Commissioner determined deficiencies in petitioner's Federal income tax as follows:

| Year | Deficiency |
|------|-----------:|
| 1974 | $347,594 |
| 1975 | 316,287 |
| 1977 | 228,335 |
| 1978 | 253,155 |
| 1979 | 324,387 |
| 1980 | 324,213 |
| 1981 | 278,851 |
| 1982 | 346,397 |
| 1983 | 455,566 |
| 1984 | 598,530 |
| 1985 | 626,338 |

After concessions, the issues presented at trial were (1) whether payments to petitioner for the use of names from petitioner's list of donors are "royalties" within the meaning of section 512(b)(2)[1] (and, therefore, excluded from unrelated business taxable income (UBTI)) or are "rents" (not excluded from UBTI), and (2) whether petitioner's exchange of the right to use names from its list of donors for a similar right to use names from the mailing lists of other organizations gives rise to imputed UBTI. After trial, we held oral argument on the legal issues in these cases. Following this hearing, respondent conceded the second issue.

### FINDINGS OF FACT

On the dates the petitions were filed in these cases, petitioner maintained its principal office in Cold Spring, Kentucky. Petitioner is a corporation chartered by an Act of Congress on June 17, 1932, and is qualified as an organization exempt from Federal income tax pursuant to section 501(a) by virtue of its being an organization described in section 501(c)(4). Petitioner's primary objective is to aid and assist wartime disabled veterans and their

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, unless otherwise indicated.

widows and dependents. For many years, petitioner has solicited contributions from the general public to obtain funds to perform its exempt functions. Petitioner's principal source of funds is donations from the public, made almost entirely in response to direct solicitations that petitioner mailed to potential donors.

Petitioner established and maintained a list of its donors (donor list) so that additional contributions could be solicited from prior contributors. For petitioner's donor list to remain productive, stale names were removed and new names were added. Names became stale when donors died, moved without a forwarding address, or ceased contributing. Petitioner obtained contributions and revenues in response to direct solicitations mailed twice a year to potential donors from 1974 through 1983 and three times a year during 1984 and 1985. Just prior to each of the petitioner's own mailings, obsolete names were deleted and the names of new contributors were added to the donor list. On receipt of address correction notifications from the U.S. Post Office showing that a former donor had died or moved without a forwarding address, petitioner removed these names from the donor list. Petitioner also corrected the donor list when the U.S. Post Office returned a mailing with a forwarding address. Petitioner purged between 15 percent and 18 percent of the names from the donor list each year.

Petitioner received contributions and revenues from its direct mail solicitations during these years in the following amounts:

| | |
|---|---|
| 1974 | $20,449,412 |
| 1975 | 20,036,437 |
| 1977 | 20,693,711 |
| 1978 | 20,460,662 |
| 1979 | 21,321,348 |
| 1980 | 23,984,143 |
| 1981 | 24,457,036 |
| 1982 | 26,496,183 |
| 1983 | 31,778,546 |
| 1984 | 33,405,956 |
| 1985 | 36,778,828 |
| Total | 279,862,262 |

The parties agree that the donor list is intangible personal property. Petitioner maintained its donor list in

computerized form during these years. Petitioner's computerized donor list enabled it to identify individual donors and segment them according to several categories such as geographic locale, amount of contribution (for example, $1, $5, $10), recency of contribution (for example, contribution within the last 6 months, contribution within the last 1 year), and other selections. Segmenting the donor list by amount of contribution allowed petitioner to mail different solicitations to appeal to contributors based on the amount of their prior contribution and to remove unproductive donors enabling petitioner to receive higher average contributions. Petitioner could mail solicitations at bulk rate by segmenting the list by ZIP code. All of these measures allowed petitioner to reduce its fund-raising costs to comply with the standards of the Council of Better Business Bureaus and the National Charities Information Bureau.

During the years at issue, petitioner, pursuant to a practice begun in 1960, permitted exempt, commercial, and fundraising organizations to use names from the donor list for mailings (mailing list) on behalf of their organizations ("exempt organizations" means organizations exempt from Federal income tax that are described in section 501(c) and to which contributions are also deductible under sections 170(c)(2) and 170(c)(3); "commercial organizations" means profit seeking, nonexempt organizations; and "fundraising organizations" means all organizations other than exempt or commercial organizations).

Petitioner received payments for the use of a mailing list (such permitted use by exempt, commercial, and fundraising organizations is hereinafter referred to as "list rental activities"). Respondent determined that the payments petitioner received from list rental activities during the years at issue gave rise to UBTI for each of those years. During the years at issue, petitioner also exchanged the use of names from the donor list for the right to use names from the mailing lists of exempt, commercial, and fundraising organizations. In accordance with the usual terminology among mailing list owners, mailing list users, and mailing list brokers, a transaction in which a list owner furnishes names from its list to a list mailer, together with the privilege of mailing to the names on such list on a one-time

basis, is described as a "list rental" or a "rental" or, to a lesser extent, as a "list reproduction" or "list use."[2] The Direct Mail Marketing Association's (DMMA) list glossary defined the term "list rental" as:

An arrangement in which a list owner furnishes names on his or her list to a mailer, together with the privilege of using the list on a one-time basis only (unless otherwise specified in advance). For this privilege, the list owner is paid a royalty by the mailer. (List Rental is the term most often used although "List Reproduction" and "List Usage" more accurately describe the transaction, since "Rental" is not used in the sense of its ordinary meaning of leasing property.)

The DMMA is a trade association composed of organizations using direct mail techniques in their operations. During the years at issue, petitioner was a member of DMMA. Representatives of petitioner regularly attended meetings and conventions of persons interested in direct mail matters.

Petitioner's "rental" information was printed on rate cards (also known as data cards). During the years at issue, it was widely known among mailing list brokers and direct mailers that petitioner's mailing list was available for "rental" and "exchange," and petitioner sent its rate cards to mailing list brokers with whom petitioner had previously had dealings. Petitioner also listed its rates in the Standard Rates and Data Service, a directory of mailing lists, in the free listing section.

Petitioner set its rental rates according to what other organizations were charging petitioner. During the years 1974 through 1985, petitioner's rental rates ranged from $20 to $45 per 1,000 names for commercial users and from $26 to $50 per 1,000 names for exempt and fundraising users. Petitioner increased the rates by $2 to $7 per 1,000 names for names categorized by amount of contribution. Petitioner increased its rates by $1 to $6 per 1,000 names for lists limited to multiple donors, recent donors, ZIP code, or for names on heat transfer rather than magnetic tape.

Throughout the years at issue, petitioner rented mailing lists to exempt and fundraising organizations at rates higher than the rates at which mailing lists were rented to

---

[2]Use of the terms "list rentals," "list rental activities," "rentals," "rents," "rented," "royalties," and "list use" does not imply any legal or factual conclusions about whether petitioner's receipts from such transactions were "royalties" or "rents."

commercial organizations. Petitioner's donor list was one of proven contributors, and it was more valuable to exempt and fundraising organizations. Consequently, petitioner charged more to exempt and fundraising organizations for the use of the names.

Petitioner would not rent less than 10,000 names; its cost of renting fewer names was greater than its receipts. Petitioner would also charge extra for names from a particular segment of the donor list. The segments a user could request included a segment based on amount of donation, recency of donation, multiple donors, new donors, and ZIP code.

Petitioner delivered a mailing list to list users in list "rental" transactions on either computer magnetic tapes or a variety of preprinted labels (such as heat transfer, gummed, or cheshire labels). After a shipment of the names and prior to the mailing date, petitioner billed the list broker or list user for the names shipped to the list user for the amount of the "rental." In transactions involving a list broker, the billing would reflect a gross billing based on petitioner's "rental" rate less the commission due the list broker in connection with the "list rental" transaction. Petitioner generally received payment by check from the list broker for the net amount due.

During the years at issue, exempt, commercial, and fundraising organizations (collectively, "list owners") typically imposed conditions on the use of their mailing lists by list users; petitioner also imposed these conditions on the use of names from its donor list. These conditions were designed to protect the value of the donor list and included the following:

(a) The right to the use of the names by the list user, restricted to a one-time mailing. Only if a particular name responded to the mailing by the list user did such name then become a name of the list user which it could then add to its mailing list;

(b) The right of approval of the particular mailing dates upon which a user was to mail using the list owner's mailing list. Part of the agreement between the list owner and each list user was that the list user would mail only within the assigned mailing dates;

(c) The right to examine and approve the mailing piece to be mailed by a user of its mailing list; and

(d) The removal of any reference to the list owner appearing in the promotional package used by the mailer.

During the years at issue, petitioner did not "rent" or "exchange" a mailing list to or with other veterans' organizations. Petitioner established dates for the use of the mailing list to protect the mailing dates of petitioner and the list users. Petitioner protected against the use of the names for 2 weeks before and after each mailing date.

List owners usually inserted "dummy" names to permit monitoring of the use of the names rented to list users. Petitioner also inserted "dummy" names to monitor the use of names rented from the donor list by list users. The dummy names were names and addresses of people connected with petitioner.

Petitioner's "rental" of its mailing list was a continuous, ongoing activity during the years at issue. Petitioner did not utilize volunteers or other unpaid workers in its list rental activities during the period 1974 through 1985. Petitioner devoted approximately 2 man-years to the list rental activities each year.

Petitioner's National Finance Committee was responsible for review and approval of any proposed list user and of the acceptability of the mailing piece. A list rental would be approved only upon a majority vote of the members of the Committee. From time to time, DAV declined to "rent" or "exchange" segments of the DAV mailing list.

During the years at issue, petitioner acquired names from list owners to replace obsolete names that had been deleted from the donor list and to add new names to expand the size of the donor list. Before petitioner rented a large quantity of names from a list owner, it would test between 10,000 and 50,000 names from the list, selected at every nth name. Internally, petitioner referred to mailing names acquired from other lists in a solicitation as a "cold shot" mailing. Petitioner evaluated the results of the cold shot mailing to determine if renting more of the list would be a cost efficient way to improve its donor list. During the years 1974 through 1985, petitioner regularly conducted its cold shot mailings either as tests or continuation mailings.

During the years 1974 through 1979, petitioner entered into list transactions with 75 different list brokers, and petitioner rented portions of its donor list in 451 transactions. For each of the years 1980 through 1985, the petitioner "rented" mailing lists to numerous exempt, commercial, and fundraising organizations. Petitioner "rented" the following quantity of names in its "list rental" transactions during the years 1982 through 1985:

| Year | Total names |
| --- | --- |
| 1982 | 41,685,385 |
| 1983 | 49,864,621 |
| 1984 | 53,706,024 |
| 1985 | 44,701,712 |

During the period 1974 through 1985, petitioner prepared a "journal voucher" to record income and expenses on a monthly basis from the "rental" of mailing lists. On each of the journal vouchers prepared by DAV, the explanation contained the following provision: "to record billings applicable to rental of names and addresses for the month of __ ." Petitioner's income from its list rental activities for the years at issue was as follows:

| | |
| --- | --- |
| 1974 | $1,301,971 |
| 1975 | 1,205,313 |
| 1977 | 1,025,727 |
| 1978 | 1,073,186 |
| 1979 | 1,237,108 |
| 1980 | 1,267,422 |
| 1981 | 1,285,408 |
| 1982 | 1,566,050 |
| 1983 | 1,956,883 |
| 1984 | 2,246,875 |
| 1985 | 2,038,441 |
| Total | 16,204,384 |

For the taxable years 1974, 1975, and 1977, petitioner filed an Exempt Organization Business Income Tax Return, Form 990-T. Petitioner did not report amounts received from its list rental activities as income. For the years 1978 through 1985, petitioner did not file an Exempt Organization Business Income Tax Return, Form 990-T, or otherwise report as income amounts which it received from its list rental activities during those years.

Petitioner is the same party who was the plaintiff in the case of *Disabled American Veterans v. United States,* 227 Ct. Cl. 474, 650 F.2d 1178 (1981). Respondent is a party in privity with the United States of America, the defendant in the Court of Claims case.

OPINION

The only issue we must decide is whether the payments petitioner received from its list rental activities are royalties, which are excluded from UBTI, or rents, which are not excluded from UBTI.[3] Petitioner's donor list is intangible property. Petitioner "rented" names from its donor list to other organizations for a one-time use. For a fee, the user organization was entitled to one use of the names, but if it received a contribution from the solicitation, it was entitled to add that name to its own contributor list. Petitioner retained all proprietary rights to its donor list.

Petitioner is an organization exempt from Federal income tax pursuant to section 501(c)(4). Sections 511 through 513 impose a tax on the unrelated business taxable income of a tax-exempt organization. UBTI is income derived from a trade or business, regularly carried on, that is not substantially related to the organization's tax-exempt purpose, less related deductions. Secs. 512(a)(1),[4] 513(a).

Petitioner concedes that the payments it received for the list rentals were from an unrelated trade or business. It relies on section 512(b)(2) which excludes royalties from UBTI to exclude its "rental" income from UBTI.

Respondent argues that *Disabled American Veterans v. United States,* 227 Ct. Cl. 474, 650 F.2d 1178 (1981) (*DAV I*), a case involving petitioner's list rental activity for prior years, controls this issue. Respondent also moved for partial summary judgment on the grounds that collateral estoppel

---

[3]The parties so formulated the issue in their stipulation.

[4]SEC. 512. UNRELATED BUSINESS TAXABLE INCOME.

(a) DEFINITION.—For purposes of this title—

(1) GENERAL RULE.—Except as otherwise provided in this subsection, the term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business, both computed with the modifications provided in subsection (b).

barred petitioner from litigating the royalty issue in this Court. We denied respondent's motion.

Collateral estoppel provides that any issue previously litigated is conclusive if the same issue is raised in a later action with respect to the same facts and the "legal climate" is unchanged. *Montana v. United States,* 440 U.S. 147, 153 (1979); *Commissioner v. Sunnen,* 333 U.S. 591 (1948). As discussed below, respondent issued Rev. Rul. 81-178, 1981-2 C.B. 135, subsequent to the litigation in *DAV I.* This ruling states legal principles to be used in interpreting "royalty" for purposes of section 512(b)(2) that were not discussed in the Court of Claims' analysis. This "change in the legal climate," *Commissioner v. Sunnen,* 333 U.S. at 606, warrants our consideration of petitioner's arguments. As the expression of his views on the exclusion from UBTI for royalties pursuant to section 512(b)(2), respondent's ruling casts doubt on the soundness of the analysis that only income from passive sources qualifies as royalties that are excluded from UBTI, which suggests the appropriateness of our consideration of the issue in this case. Compare *Union Carbide Corp. v. Commissioner,* 75 T.C. 220, 253 (1980), affd. per curiam 671 F.2d 67 (2d Cir. 1982).

Section 512(a) defines UBTI generally. Section 512(b)(2) modifies section 512(a) and provides:

There shall be excluded [from UBTI] all royalties (including overriding royalties) whether measured by production or by gross or taxable income from the property, and all deductions directly connected with such income.

The regulations generally refer to "royalty" as income derived from the disposition or use of mineral rights.[5]

---

[5]Sec. 1.512(b)-1(b), Income Tax Regs., provides:

(b) *Royalties.* Royalties, including overriding royalties, and all deductions directly connected with such income shall be excluded in computing unrelated business taxable income. Mineral royalties shall be excluded whether measured by production or by gross or taxable income from the mineral property. However, where an organization owns a working interest in a mineral property, and is not relieved of its share of the development costs by the terms of any agreement with an operator, income received from such an interest shall not be excluded. To the extent not treated as a loan under section 636, payments in discharge of mineral production payments shall be treated in the same manner as royalty payments for the purpose of computing unrelated business taxable income. To the extent treated as a loan under section 636, the amount of any payment in discharge of a production payment which is the equivalent of interest shall be treated as interest for purposes of section 512(b)(1) and paragraph (a) of this section.

Respondent, however, announced his interpretation of "royalty" in Rev. Rul. 76-297, 1976-2 C.B. 178 (amounts paid to section 501(c)(3) organization pursuant to agreements licensing its patents were royalty income for purposes of section 512(b)(2)), and reaffirmed this view in Rev. Rul. 81-178, *supra.*

In Rev. Rul. 81-178, *supra,* a 501(c)(5) organization of professional athletes received proceeds from licensing the use of the organization's "trademarks, trade names, service marks, copyrights, and members' names, photographs, likenesses, and facsimile signatures in connection with the distribution, sale, advertising, and promotion of merchandise or services." Rev. Rul. 81-178, *supra* at 135. The organization had the right to approve the "quality or style of the licensed products and services." The licensees, which were commercial organizations, agreed to refrain from any activities that would affect adversely the organization or its members, or the value of the licensed products or services. Rev. Rul. 81-178, *supra* at 136. The licensees paid the organization either a percentage of gross sales or a flat sum.

Applying the general rule that a royalty is a payment for the right to use an intangible asset, the ruling concluded that the payments under the licensing agreements were royalties and, therefore, were excludable from UBTI pursuant to section 512. Rev. Rul. 81-178, *supra* at 136. The fact that the organization retained the right to approve quality or style was immaterial to respondent's conclusion. Also immaterial was the fact that the exempt organization's transactions were with commercial businesses. If an agreement also required personal appearances by the members of the organization, however, the ruling concluded that the payments were compensation for personal services and were not royalties. Rev. Rul. 81-178, *supra* at 137.

The analysis of Rev. Rul 81-178 follows a number of cases holding that royalties are payments for the use of valuable intangible property rights and, we believe, is a correct statement of the law. The cited cases held that royalties include payments for the right to use athletes' names, *Cepeda v. Swift & Co.,* 415 F.2d 1205 (8th Cir. 1969); *Uhlaender v. Henricksen,* 316 F. Supp. 1277 (D. Minn.

1970); and payments for the rights to use copyrights, literary works, motion picture rights, and dramatic rights, *Commissioner v. Wodehouse,* 337 U.S. 369 (1949); *Rohmer v. Commissioner,* 153 F.2d 61 (2d Cir. 1946), cert. denied 328 U.S. 862 (1946); and *Sabatini v. Commissioner,* 98 F.2d 753 (2d Cir. 1938) (in the context of determining gross income from sources within the United States); *Commissioner v. Affiliated Enterprises, Inc.,* 123 F.2d 665 (10th Cir. 1941), cert. denied 315 U.S. 812 (1942) (personal holding company provisions). The ruling in effect applies the well-accepted, general meaning of "royalty" to interpret section 512(b)(2).

As a matter of statutory construction, identical words used in different parts of the Internal Revenue Code are normally given the same meaning. *Rowan Companies, Inc. v. United States,* 452 U.S. 247 (1981); *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 87 (1934). Respondent followed this general proposition in Rev. Rul. 81-178 by looking to personal holding company and foreign tax credit provisions for guidance in interpreting section 512(b)(2).

Respondent, however, argues in this case that, notwithstanding the case law defining "royalty" and his acknowledgment of the applicability of that law in Rev. Rul. 81-178, "royalty" for purposes of section 512(b)(2) has a different and narrower meaning than for other provisions of the Code because of the different policies underlying the rules for tax-exempt organizations. The policy that respondent points to is Congress' intention to tax an exempt organization when it competes with taxpaying commercial organizations. It is unclear what competition petitioner's donor list offers to commercial organizations. Like most other intangible assets, the donor list is unique. Regardless of that fact, the parties agree that petitioner's activity was an unrelated trade or business.

Respondent argues that the source of petitioner's income was an active business. In his view, the statute only excludes "passive" income. The "rentals," therefore, cannot be a "royalty." Respondent has acknowledged in his rulings, however, the broad meaning of "royalty" and by referring to other businesses' royalty income, respondent

has correctly focused the test on whether payments are for the right to use intangible property. The policy of the statute (which, after all, must be found in the statutory language) does not offer any basis for characterizing royalties earned by a tax-exempt organization differently from royalties earned by a commercial organization. Respondent can offer no principle to hold that income from licensing the use of intangible property rights is something other than "royalties." Respondent has simply not justified why petitioner's royalty income from an unrelated trade or business should be treated differently from the same income generated by any other trade or business.

"Royalty" income is defined for personal holding company purposes, and royalties are generally included in personal holding company income. Sec. 543(a)(1). The regulations define royalties, other than mineral, oil, or gas royalties, as "amounts received for the privilege of using patents, copyrights, secret processes and formulas, good will, trade marks, trade brands, franchises, and other like property. It does not, however, include rents." Sec. 1.543-1(b)(3), Income Tax Regs. Payments for the right to use intangibles generally are royalties for personal holding company purposes. Payments for the right to use tangible property are generally rents. See also *Montgomery Coca-Cola Bottling Co. v. United States*, 222 Ct. Cl. 356, 615 F.2d 1318 (1980) (payments for use of Coca-Cola franchise were royalties and therefore personal holding company income); *Hugh Smith, Inc. v. Commissioner*, 8 T.C. 660 (1947), affd. per curiam 173 F.2d 224 (6th Cir. 1949), cert. denied 337 U.S. 918 (1949) (payments for use of Coca-Cola trademark were royalties and, therefore, personal holding company income).

The donor list is an intangible asset. A list user purchases the right to use a portion of the donor list one time and may appropriate a name to its own list only if a donor responds to a one-time solicitation. Petitioner's list rental activities were licenses of the use of its intangible asset. We hold that the payments petitioner received for the use of names from the donor list were royalties for purposes of section 512(b)(2).

Respondent further argues that the payments could be royalties for purposes of section 512(b)(2) only if petitioner's activities in generating the payments were passive, citing *DAV I, supra.* The effort that petitioner expended in creating and expanding the donor list is entirely consistent with our holding. Petitioner removed stale names from and added new names to the donor list. It obtained new names by renting names from other lists or exchanging portions of the donor list. Petitioner thus kept the donor list productive. A productive list increased petitioner's ability to solicit contributions and also increased the value of petitioner's intangible property. The increased ability to solicit contributions is, respondent agrees, a normal goal of a tax-exempt organization. Any holder of a valuable intangible asset may improve the value or character of its asset without affecting the characterization of the payments it receives when it licenses the improved product.

Nevertheless, respondent argues that because petitioner engaged in extensive business activities to generate the income from the list rentals, the amounts it received could not be royalties.[6] In support of his argument, respondent states that petitioner: (1) Sent rate cards to brokers and trade publications; (2) approved all copy for the mailings; (3) monitored the use of the donor list by including dummy names in the rented lists; (4) paid its personnel to conduct the list rental activities; (5) established an operating procedure for list rental activities and maintained extensive records of the revenues and expenses; (6) entered into a separate contract for each transaction, each with independent terms; (7) charged the licensee a higher rate if it created specifications for its list, such as by geographical location of the donor or by amount of the donation; and (8) excluded names from a list that a licensee had rented on a prior occasion.

Respondent's position fuses the issue of whether a tax-exempt organization is engaged in an unrelated trade or

---

[6]We note that both royalties and rents can be passive income. Respondent's argument that the payments were not passive income to petitioners, therefore, does not further his stipulated position that the payments are rents. The payments to petitioner could be passive rental income. Respondent argues that: (1) Royalties are passive, (2) these payments were not passive, and, (3) therefore, the payments were not royalties. It does not follow, however, that the payments were rents. Moreover, as discussed in the text, respondent's premise erroneously assumes that royalties must be from passive sources.

business with the issue of whether a payment is a royalty. Some of the factors respondent uses to show petitioner's extensive business activity are relevant to determine that petitioner was engaged in an unrelated trade or business: petitioner sent rate cards to brokers, used its own paid personnel for the list rental activities, followed a standard procedure, kept records, and provided names from segments of the donor list. The issue is, however, whether the payments are royalties. If they are, the statute excludes them from UBTI.

Providing segments of the donor list is analogous to franchising within a defined geographical area. The holder of any intangible asset may license it for use within a limited geographical area without changing the nature of the payments received for its use. Licensing the names for a single use does not appear to change a payment for that use from a royalty into something else. Certainly petitioner retained all of its rights in the donor list regardless of the number of times that use of names from the donor list was licensed. Moreover, business activity does not transform payments that would otherwise be royalties into something else. A taxpayer may license an intangible asset and expend a great deal of effort to make the intangible asset valuable, but the payments received for the use of the intangible asset are nevertheless characterized as royalties. *Montgomery Coca-Cola Bottling Co. v. United States, supra; Hugh Smith, Inc. v. Commissioner, supra;* see also *Lane-Wells Co. v. Commissioner,* 43 B.T.A. 463, 474 (1941) (payments for the use of the taxpayer's patents and payments for the taxpayer's improvement of the licensed patents were royalties). A "royalty," therefore, is not necessarily derived from passive sources.

Respondent argues that because petitioner protected against unauthorized use of the donor list, the payments were not royalties. Petitioner entered into separate contracts for each transaction, reviewed the contents of any mailing piece before approving the list user, and protected its property by inserting dummy names into the rental lists. The separate contracts for each transaction, however, are merely separate licensing contracts for petitioner's intangible asset. As respondent recognized in Rev. Rul. 81-178, a

taxpayer that protects its intangible asset by determining the acceptability of the mailing copy does not convert royalty income into something else. In *Wm. J. Lemp Brewing Co. v. Commissioner*, 18 T.C. 586 (1952), the taxpayer licensed the right to sell "Lemp" beer to another corporation and retained the right to supervise the methods of brewing, advertising, and marketing the beer. We held that the taxpayer did not enter into a joint venture with the licensee but licensed the use of its intangible rights. Petitioner did not change the nature of the payments received for use of its valuable intangible asset by protecting its value.

Respondent argues that the Court of Claims correctly defined royalty for purposes of section 512(b)(2) in *DAV I.* The Court of Claims stated:

section 512(b) excludes from taxation the conventional type of passive investment income traditionally earned by exempt organizations (dividends, interest, annuities, real property rents). * * * DAV's list rentals are the product of extensive business activity by DAV and do not fit within the types of "passive" income set forth in section 512(b). [*DAV I, supra* at 1189.]

We believe, however, that section 512(b) is not written in language that restricts "royalty" to include only royalties from passive sources. Congress has distinguished between passive royalties and those derived from the active conduct of a business in other statutory language of the Code but not in section 512(b)(2). E.g., sec. 954(c)(2) (treatment of royalties derived from the *active* conduct of a trade or business for purposes of determining the foreign personal holding company income of controlled foreign corporations); sec. 543(a)(1)(C) (rule excluding *active* business computer software royalties from personal holding company income). We will not read a requirement into the Code that income must be derived from passive sources when Congress has not chosen to include such a requirement. See *Marshall v. Commissioner*, 510 F.2d 259 (10th Cir. 1975), affg. 60 T.C. 242 (1973); *Commissioner v. Adam, Meldrum & Anderson Co.*, 215 F.2d 163, 166 (2d Cir. 1954), revg. 19 T.C. 1130 (1953); *Buhler Mortgage Co. v. Commissioner*, 51 T.C. 971, 977 (1969), affd. per curiam 443 F.2d 1362 (9th Cir. 1971).

The structure of the statute, i.e., the relationship between section 512(a) and section 512(b), suggests that Congress did not mean to exclude royalties from UBTI only if they were derived from agreements entered into outside the conduct of an active business. Section 512(a) requires an identification of gross income derived from an unrelated trade or business without distinction between active and passive income. It does not sweep into gross income any royalty, for example, that is derived from conducting a *related* business. If a royalty is not connected with an unrelated trade or business, it too, would not be swept into "gross income" within the meaning of section 512(a). In short, there is no reason to exclude "royalties" under section 512(b) if those royalties are not part of "gross income" within the meaning of section 512(a). The royalties swept into "gross income" are those that are "derived * * * from any unrelated trade or business."

Section 512(b) then modifies the amount of gross income determined pursuant to section 512(a) by excluding "royalties" from UBTI. The income that is removed from UBTI pursuant to section 512(b), therefore, is all royalty income connected with the unrelated trade or business that generated the gross income determined under section 512(a).

We have recently considered whether payments received by tax-exempt organizations were royalties pursuant to section 512(b)(2). *National Collegiate Athletic Assn. v. Commissioner,* 92 T.C. 456 (1989); *National Water Well Assn. Inc. v. Commissioner,* 92 T.C. 75 (1989); and *Fraternal Order of Police v. Commissioner,* 87 T.C. 747 (1986), affd. 833 F.2d 717 (7th Cir. 1987). None of these cases suggests a different analysis.

In *National Collegiate Athletic Assn. v. Commissioner, supra,* a tax-exempt organization contracted with a commercial organization to publish and sell programs, including advertising in the programs, at the NCAA's Final Four basketball games. We held that the contract established a principal and agency relationship between the taxpayer and the commercial organization. As a result, the conduct of the commercial organization was attributed to the taxpayer, and the payments it received were, therefore, regarded as

income from advertising and not from royalties. 92 T.C. 456, 466, 470.

In *National Water Well Assn. Inc. v. Commissioner, supra,* the taxpayer, a tax-exempt trade association, sponsored an insurance program for its members. The taxpayer received insurance dividends in return. We held that the dividends were not royalties but were compensation for services. 92 T.C. 75, 101.

In *Fraternal Order of Police v. Commissioner, supra,* a tax-exempt organization published a magazine and received a percentage of the revenues paid by advertisers. We held that the taxpayer received advertising revenues and not royalties because, in effect, it derived its income as profits from a publishing business. 87 T.C. 747, 757-758.

The taxpayers in these three cases each received revenues derived from advertising or compensation for services. In each case the taxpayer specifically did not receive payments for the use of an intangible. By contrast, in this case payments were received solely for the licensing of petitioner's intangible asset and were determined solely by the nature of the intangible and the right to use it. These payments were not compensation for services or other profits masquerading as royalties.

Respondent argues further that in *National Water Well Assn.* we approved the *DAV I* formulation of the principle that all "royalties" within the meaning of section 512(b)(2) must be passive. The issue presented by petitioner, however, was not presented to us in *National Water Well Assn.* We cited *DAV I* in *National Water Well Assn.* to reject the taxpayer's argument that the dividend it received from an insurance company was a royalty. We stated that the "income petitioner received was not passive income but more akin to compensation for services rendered and so was not royalty income." *National Water Well Assn. v. Commissioner, supra* at 101. The matter in controversy was the proper characterization of the payment, not whether "active" royalties are excluded from UBTI by section 512(b)(2). The proper characterization of a payment does not, of course, depend on its label. We were not deciding that the taxpayer's income was an "active" royalty; we were deciding that the nature of the taxpayer's income was compensa-

tion for services and not royalty income. In this case, petitioner's income from its list rental activities is properly characterized as royalties.

At oral argument, respondent attempted to recharacterize the rental payments as compensation for services. Respondent argued that the payments were for services because petitioner segmented the donor list and included dummy names with the names it rented. We note that the parties stipulated that the payments were either rents or royalties; the parties stipulated away the issue of whether the payments were compensation for services. In any event, the services that petitioner provided in conjunction with the list rental activities were de minimis. Had services that were provided been predominant, our conclusion about the character of the income generated would change. Cf., e.g., sec. 1.512(b)-1(c)(5), Income Tax Regs. (payments received for the use of real property are not rents if the owner of the real property also provided services, such as in the case of rooms in hotels or boarding houses). In this case, the income from the use of names from the donor list predominates, and any services were ancillary.

Moreover, some of the "services" that respondent points to were to create and improve the donor list, and were not performed in conjunction with the list rental activities. Petitioner segmented the donor list primarily for its own charitable purposes. By segmenting the donor list, petitioner targeted specific groups of donors and reduced its costs of soliciting contributions. During the years at issue, petitioner received $279,862,262 in charitable contributions in response to its direct mail solicitations. The ability to retrieve a segment already existed when petitioner "rented" names from the donor list, and the services connected with "renting" segments of the donor list were de minimis.

Finally, we have already decided that protecting the donor list by inserting dummy names does not affect the characterization of the payments as royalties. We also note that a list user would hardly pay petitioner for the "service" of inserting dummy names. Use of the dummy names is not a service to the list users. We conclude that all of the "rental" payments were for the use of the donor list and were not compensation for services.

In view of the foregoing and concessions,

> *Decision in docket No. 34856-87 will be entered under Rule 155.*
> *Decision in docket No. 37361-87 will be entered for the petitioner.*

Reviewed by the Court.

NIMS, CHABOT, KÖRNER, HAMBLEN, COHEN, CLAPP, WRIGHT, PARR, WELLS, WHALEN, and COLVIN, *JJ.*, agree with the majority opinion.

SHIELDS and RUWE, *JJ.*, did not participate in the consideration of this opinion.

---

SWIFT, *J.*, respectfully dissenting: The majority opinion summarily rejects and misinterprets substantial case authority of this and other courts that is contrary to the holding in this case. The Court of Claims in a case involving petitioner herein and this Court in three recent published opinions expressly have held that the exception provided in section 512(b)(2) encompasses only those royalties earned by tax-exempt organizations from traditional sources of passive investment income. The Court of Appeals for the Seventh Circuit has cited with approval the Court of Claims decision and affirmed one of our decisions on this same point.

The Court of Claims decision in *Disabled American Veterans v. United States,* 227 Ct. Cl. 474, 650 F.2d 1178 (1981) (*DAV I*), is discussed summarily in the majority opinion. That decision is precisely on point with all of the material facts and applicable law of this case. Therein, the Court of Claims expressly held, as follows:

section 512(b) excludes from taxation the conventional type of passive investment income traditionally earned by exempt organizations (dividends, interest, annuities, real property rents). * * * DAV's list rentals are the product of extensive business activity by DAV and do not fit within the types of "passive" income set forth in section 512(b). * * * [650 F.2d at 1189. Citations omitted.]

In *Fraternal Order of Police v. Commissioner,* 87 T.C. 747 (1986), affd. 833 F.2d 717 (7th Cir. 1987), the tax-exempt organization, among other things, made essentially the same argument as petitioner herein (namely, that all royal-

ties were exempt under section 512(b)(2) from treatment as unrelated business taxable income). In our opinion in that case, we expressly rejected that argument, and we expressly cited with approval and quoted from the Court of Claims opinion in *DAV I.* 87 T.C. at 757, 758. The ultimate holding of *Fraternal Order of Police v. Commissioner, supra,* makes it crystal clear that if the income in question does not represent passive income, it cannot qualify under the "royalty" exception of section 512(b)(2). We stated as follows:

> We conclude, therefore, that petitioner's role was not passive, the receipts from the listings did not constitute royalties, and such receipts are not excluded under section 512(b)(2) from petitioner's unrelated business taxable income. [87 T.C. at 758.]

Our opinion in *Fraternal Order of Police v. Commissioner, supra,* was affirmed by the Seventh Circuit, and the Seventh Circuit also cited with approval the Court of Claims opinion in *DAV I.* See *F.O.P., Ill. State Troopers, Lodge 41 v. Commissioner,* 833 F.2d 717, 723 (7th Cir. 1987).

In *National Water Well Association, Inc. v. Commissioner,* 92 T.C. 75, 100 (1989), we again held, among other things, that the income in question did not constitute royalties within the meaning of section 512(b)(2) because the income was not passive income. After citing with approval on this point the Court of Claims opinion in *DAV I* and our earlier opinion in *Fraternal Order of Police v. Commissioner, supra,* we expressly made the nonpassive nature of the income the basis for our holding that the income did not qualify for the royalty exception of section 512(b)(2). 92 T.C. 100-101.

In *NCAA v. Commissioner,* 92 T.C. 456 (1989), we, among other things, addressed yet again the issue of whether the royalty exception of section 512(b)(2) included nonpassive income. Again citing with approval on this issue the holdings of *DAV I* and *Fraternal Order of Police v. Commissioner, supra,* as well as *National Water Well Association, Inc. v. Commissioner, supra,* we stated that where the income in question is not passive income to the tax-exempt organization, the royalty exception does not apply. 92 T.C. 468-470. See also the discussion in 6

Mertens, Law of Federal Income Taxation, sec. 34.14a, pp. 120-122 (1983 rev.), which explains some of the history of the passive-income requirement which underlies the section 512(b)(2) exception to unrelated-business-taxable-income treatment.

Petitioner herein concedes that the income in question arises from the active conduct of a trade or business and does not qualify as passive income. Unless we are prepared to overrule the controlling authority of this and other courts on this issue, the well-established principles of stare decisis and collateral estoppel are directly applicable and require us to follow the above-referenced substantial authority and to hold for respondent. With regard to stare decisis, the Supreme Court recently stated as follows:

the important doctrine of *stare decisis* [is] the means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion. * * * While *stare decisis* is not an inexorable command, the careful observer will discern that any detours from the straight path of *stare decisis* in our past have occurred for articulable reasons, and only when the Court has felt obliged "to bring its opinions into agreement with experience and with facts newly ascertained." *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 412 (1932) (Brandeis J., dissenting).

Our history does not impose any rigid formula to constrain the Court in the disposition of cases. Rather, its lesson is that every successful proponent of overruling precedent has borne the heavy burden of persuading the Court that * * * the values served by *stare decisis* yield in favor of a greater objective. * * * [*Vasquez v. Hillery,* 474 U.S. 254, 265-266 (1986).]

With regard to the appropriate application of collateral estoppel to the resolution of the issue in this case based on the Court of Claims opinion in *DAV I,* see *Montana v. United States,* 440 U.S. 147, 155 (1979) and *Meier v. Commissioner,* 91 T.C. 273, 282-286 (1988) (Court reviewed).

In an attempt to avoid the collateral estoppel effect of *DAV I,* the majority opinion suggests that Rev. Rul. 81-178, 1981-2 C.B. 135, represents a change in the legal climate that existed when *DAV I* was decided. Rev. Rul. 81-178, however, was discussed in our opinion in *NCAA v. Commissioner, supra,* and nothing in the ruling was perceived by us at that time as being inconsistent with *DAV I,*

92 T.C. at 468-469; nor do I perceive anything in Rev. Rul. 81-178 inconsistent with *DAV I.*

For the reasons stated, I respectfully dissent.[1]

PARKER, JACOBS, and GERBER, *JJ.,* agree with this dissent.

---

[1]This dissent does not address further factual questions that could be raised about whether the majority opinion correctly treats as "royalties" income which the mailing-list industry and the parties herein generally refer to as "rental" income. Note that petitioner's customers, prior to doing business with petitioner, already had the right to mail solicitations to anyone in the country. Mere "information" (namely, a list of names and addresses) was transferred by petitioner to its customers. The transactions before us look more like one-time rentals of information in exchange for fixed rental income than licenses over a period of time of intangible property rights in exchange for royalty income.