SIERRA CLUB, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sierra Club, Inc. v. Commissioner
Docket No. 8650-91
United States Tax Court
T.C. Memo 1993-199; 1993 Tax Ct. Memo LEXIS 202; 65 T.C.M. (CCH) 2582; May 10, 1993, Filed *202 P is an organization generally exempt from Federal income taxation under sec. 501(a), I.R.C., as an organization described in sec. 501(c)(4), I.R.C. Among other things, P has assigned error to R's determination that income from P's rental of its mailing lists constitutes unrelated business taxable income within the meaning of sec. 512(a)(1), I.R.C. Both parties have moved for partial summary judgment on that issue. 1. Held: Disabled American Veterans v. Commissioner, 94 T.C. 60 (1990), revd. on other grounds 942 F.2d 309 (6th Cir. 1991), followed, in that, since the mailing lists are intangible property, all consideration received for the use of those lists constitutes royalties within the meaning of sec. 512(b)(2), I.R.C. No issue of material fact exists on that point, and we grant P's motion for partial summary judgment with respect to that issue. R's cross-motion for summary judgment is denied. 2. Held, further, a material question of fact does exist as to the extent, if any, of the income derived by P from the sale of the media on which the mailing lists were furnished. The respective motions for *203 partial summary judgment on that issue are denied. 3. Held, further, a material question of fact does exist on the issue of whether P sold substantial services in connection with the rental of its mailing lists. The respective motions for partial summary judgment on that issue are denied. For Petitioner: B. Holly Schadler and Karl L. Kellar. For respondent: Dianne I. Crosby. HALPERN
HALPERN
MEMORANDUM OPINION HALPERN, Judge: By notice of deficiency dated February 11, 1991, respondent determined deficiencies in petitioner's Federal income tax liabilities for petitioner's taxable years ended September 30, 1985, 1986, and 1987, in the amounts of $ 12,654, $ 22,591, and $ 152,514, respectively. In its petition, petitioner assigned error to respondent's determinations that (1) income from petitioner's rental of its mailing lists constituted unrelated business taxable income within the meaning of section 512(a)(1)[1] and (2) royalties received by petitioner with respect to an "affinity credit card" program engaged in by petitioner likewise constituted such unrelated business taxable income. In its petition, petitioner also sought a refund of Federal income taxes paid *204 for its taxable years ended September 30, 1985, 1986, and 1987, on account of income from the rental of its mailing lists. Among motions presently before the Court is petitioner's motion for partial summary judgment filed October 8, 1992. Respondent objected to petitioner's motion and filed her own motion for partial summary judgment on December 15, 1992. Petitioner has made various motions in response to respondent's motion, which, in effect, amount to an objection thereto. The common subject of petitioner's and respondent's motions for partial summary judgment is whether income from petitioner's rental of its mailing lists constitutes unrelated business taxable income within the meaning of section 512(a)(1). Petitioner argues no, while respondent argues yes. As will be explained, we agree with petitioner. Introduction
*205 The parties have filed a joint stipulation of facts and attached stipulated documents as well as various affidavits and memoranda of law. We accept the stipulated facts as being true for purposes of deciding the motions for partial summary judgment. The stipulation of facts and attached documents are incorporated herein by this reference. The following recitation of facts is drawn primarily from the joint stipulation. Certain other facts (which facts we deem noncontroversial) are included. Petitioner is exempt from most Federal income taxation under section 501(a) as an organization described in section 501(c)(4). Petitioner was organized in 1892 to: explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.
At the time the petition in this case was filed, petitioner's principal office was located in San Francisco, California. During the years in question, petitioner raised funds to support its activities. As part of its *206 fund-raising activities, petitioner developed and maintained mailing lists composed of names, addresses, and related information regarding its members, donors, catalog purchasers, and other supporters. Petitioner had exclusive ownership rights in its mailing lists, including the right to all net income from its mailing lists. Petitioner updated and maintained its lists on a regular basis. In order to acquire names of prospective members and supporters, petitioner would sometimes undertake list exchanges with other organizations (granting the right to use names from petitioner's lists in exchange for the right to use names from another organization's lists). Petitioner permitted other tax-exempt organizations and commercial entities to pay a fee in order to use petitioner's mailing lists on a one-time basis per transaction. Users paid a fee as set forth in a rate schedule. The external uses of petitioner's lists of members, donors, and other supporters were overseen and administered by Names in the News, a professional list manager and broker. Chilcutt Direct Marketing, Inc., performed similar services with respect to petitioner's list of catalog purchasers. Orders for petitioner's *207 mailing lists were filled by Triplex Direct Marketing Corp. (Triplex), a computer service bureau that maintained a computerized database of petitioner's mailing lists. Petitioner retained the right to: (1) Refuse any request to use its lists, (2) review any mailing to be sent by a user of its lists, and (3) approve the mailing schedule for any user. Petitioner inserted seed names in its mailing lists in order to protect against abuse and unauthorized use of its mailing lists. During the years in issue, petitioner reported gross income from the customers' use of its mailing lists as follows: 1985
$ 142,636
1986
317,579
1987
452,042
Discussion
I. Summary Judgment
A summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b). Summary judgment is a device used to expedite litigation and is intended to avoid unnecessary and expensive trials of phantom factual questions. Cox v. American Fidelity & Casualty Co., 249 F.2d 616, 618 (9th Cir. 1957); *208 Espinoza v. Commissioner, 78 T.C. 412, 415-416 (1982); Shiosaki v. Commissioner, 61 T.C. 861 (1974). It is not, however, a substitute for a trial in that disputes over factual issues are not to be resolved in such proceedings. Espinoza v. Commissioner, supra; Matson Navigation Co. v. Commissioner, 67 T.C. 938 (1977); Giordano v. Commissioner, 63 T.C. 462 (1975). The party moving for summary judgment has the burden of showing the absence of a genuine issue as to any material fact. Shiosaki v. Commissioner, supra; Hitachi Sales Corp. v. Commissioner, T.C. Memo. 1992-504. The opposing party is to be afforded the benefit of all reasonable doubt, and any inference to be drawn from the underlying facts contained in the record must be viewed in a light most favorable to the party opposing the motion for summary judgment. United States v. Diebold, 369 U.S. 654 (1962); Espinoza v. Commissioner, supra. *209 Nevertheless, the opposing party cannot rest upon the allegations or denials in his pleadings, but must "set forth specific facts showing that there is a genuine issue for trial." Rule 121(d); Morrison v. Commissioner, 81 T.C. 644, 650-651 (1983). Since the effect of granting a motion for summary judgment is to decide the case against a party without allowing him an opportunity for a trial, such motion should be "cautiously invoked" and only granted after a careful consideration of the case. Associated Press v. United States, 326 U.S. 1, 6 (1945); Shiosaki v. Commissioner, supra.
II. Royalties Excluded From Unrelated Business Taxable Income
Section 511(a)(1) imposes a tax on the unrelated business taxable income (UBTI) of certain otherwise tax-exempt organizations described in section 511(a)(2). Among the organizations described in section 511(a)(2) are organizations described in section 501(c)(4) (petitioner is described in section 501(c)(4)). UBTI is gross income derived from a trade or business, regularly carried on, that is not substantially related to the organization's *210 tax-exempt purpose, less related deductions, and subject to certain modifications. Secs. 512(a)(1) and 513. The modifications to be made in computing UBTI are described in section 512(b). Section 512(b)(2) excludes from the computation of UBTI "all royalties" and all deductions directly connected thereto. [2] Thus, put simply, royalty income, within the meaning of section 512(b)(2), is not subject to the tax imposed on UBTI notwithstanding that (1) it is earned by an organization described in section 511(a)(2), from (2) a trade or business unrelated to that organization's exempt purposes, which (3) business is regularly carried on by that organization. The question here presented concerns the meaning of the term "royalties", as used in section 512(b)(2). III. Disabled American *211 Veterans v. Commissioner
In Disabled American Veterans v. Commissioner, 94 T.C. 60 (1990) (hereinafter referred to as DAV II), revd. on other grounds 942 F.2d 309 (6th Cir. 1991), this Court considered the meaning of the term "royalties", as used in section 512(b)(2). [3] That case involved the proper classification (as section 512(b)(2) royalties or something else) of payments received by an organization described in section 501(c)(4) in consideration of that organization making available to others its donor list for limited use by such others. We accepted the conventional definition of the term "royalties": "payments for the use of valuable intangible property rights". Id. at 70. We rejected respondent's arguments that, as used in section 512(b)(2), the term "royalties" included only royalties from passive sources. Id. at 75. We stated our disagreement with the Court of Claims that section 512(b)(2) is written in language that restricts "royalties" to include only royalties from passive sources. Id. (setting forth and rejecting the position of the Court of Claims as stated in Disabled American Veterans v. United States, 227 Ct. Cl. 474, 650 F.2d 1178, 1189 (1981)). *212 Furthermore, in the course of our analysis in DAV II, we made it clear that Congress did not intend to exclude from section 512(b)(2), royalties derived from carrying on a trade or business: The structure of the statute, i.e., the relationship between section 512(a) and 512(b), suggests that Congress did not mean to exclude royalties *213 from UBTI only if they were derived from agreements entered into outside the conduct of an active business. Section 512(a) requires an identification of gross income derived from an unrelated trade or business without distinction between active and passive income. It does not sweep into gross income any royalty, for example, that is derived from conducting a related business. If a royalty is not connected with an unrelated trade or business, it too, would not be swept into "gross income" within the meaning of section 512(a). In short, there is no reason to exclude "royalties" under section 512(b) if those royalties are not part of "gross income" within the meaning of section 512(a). The royalties swept into "gross income" are those that are "derived * * * from any unrelated trade or business." Section 512(b) then modifies the amount of gross income determined pursuant to section 512(a) by excluding "royalties" from UBTI. The income that is removed from UBTI pursuant to section 512(b), therefore, is all royalty income connected with the unrelated trade or business that generated the gross income determined under section 512(a). [Id. at 76.]
We discussed a number *214 of recent cases of ours in which the question was whether payments received by tax-exempt organizations were royalties within the meaning of section 512(b)(2). [4] We made it clear that we could distinguish payments for the use of an intangible, which constitute a royalty, from payments for advertising, compensation for services, or other profits masquerading as royalties. Id. at 77.
The parties had agreed that the donor lists in question were intangible *215 assets. We concluded that the income-producing activities in question were licenses of the use of intangible assets. We held that the income from such licenses was a royalty for purposes of section 512(b)(2). Id. at 72. IV. Petitioner's Motion For Partial Summary Judgment
Petitioner moves for partial summary judgment that any income realized to it from the rental of its mailing lists during the years in question did not constitute UBTI within the meaning of section 512(a)(1) because it constituted royalty income within the meaning of section 512(b)(2). In support of its motion, petitioner argues that there are no material facts in issue and that petitioner is entitled to summary judgment on the authority of DAV II. Petitioner has submitted no affidavits in support of its motion. Petitioner has submitted a memorandum of points and authorities in support of its motion. Petitioner relies on those facts contained in the joint stipulation of facts filed by the parties and certain other noncontroversial facts. The bulk of petitioner's legal argument consists of a recapitulation of our opinion in DAV II. V. Respondent's Objection
A. Introduction
Respondent *216 objects to petitioner's motion for partial summary judgment on the grounds that there are "unresolved genuine issues of material fact" and that "petitioner proposes application of incorrect legal tests". In support of her objection, respondent relies on facts contained in the joint stipulation of facts filed by the parties and on three affidavits submitted by respondent with her notice of objection. Those affidavits are of: (1) Dianne I. Crosby, an attorney representing respondent in this case, (2) John Kehoe, director of the List Brokerage and List Management Division of Ed Burnett Consultants, a division of Database America Companies, an expert proffered by respondent, and (3) Don Chilcutt, president of Chilcutt Direct Marketing, Inc. (Chilcutt), a list manager and list broker who, during the years in question, provided list management services to petitioner in connection with its list of catalog purchasers. John Kehoe's affidavit is accompanied by a document entitled "Expert Witness Report of John Kehoe". Respondent has also filed a memorandum of points and authorities in support of her objection (respondent's memorandum). The affidavits of Dianne I. Crosby (the Crosby affidavit) *217 and John Kehoe (the Kehoe affidavit) were the subject of petitioner's motion to strike affidavits and for other relief. The gravamen of petitioner's complaint with regard to the Crosby affidavit was that it was not based on personal knowledge, since it contained, for the most part, a recitation of Ms. Crosby's beliefs as to what others (both fact and expert witnesses) would testify to if called at trial. We have denied petitioner's motion. In doing so, however, we have agreed to consider the Crosby affidavit solely for the limited purpose of setting forth information that, with regard to two potential witnesses, Names in the News and Chilcutt, respondent, through no fault of her own, may have been unable to present through affidavits. See Rule 121(e). For that limited purpose alone, we will consider the Crosby affidavit. B. Respondent's Arguments
As in DAV II, respondent's focus is here on the meaning of the term "royalties", as used in section 512(b)(2). In DAV II, we accepted a conventional definition of the term "royalties" ("payments for the use of valuable intangible property rights") and rejected respondent's argument that, for purposes of section 512(b)(2), Congress *218 intended a different and narrower meaning, excluding all but passive income. Id. at 70-71. In respondent's memorandum, she apparently concedes that Congress did not intend to draw any distinction between active and passive income in defining "royalties" for purposes of section 512(b)(2) ("The 'activity' or 'passivity' of a taxpayer vis-a-vis its income-producing activities is not determinative of the issue of whether a particular item of income is the type which Congress intended to exempt from UBTI."). Nevertheless, apparently continuing to believe that the term "royalties" was used by Congress in some special sense in section 512(b)(2), respondent argues that, in using the term "royalties" in section 512(b)(2), Congress had in mind only "investment income", and intended the term "royalties" in that section to describe only income of that character. Respondent points to a 1986 addition to the UBTI provisions (section 513(h)) as supporting her argument that Congress used the term "royalties" in some special sense. Alternatively, if we persist in our analysis contained in DAV II, respondent argues that (1) petitioner was "selling intangible property" [5] and (2) petitioner *219 was "paid for performance of services". [6]
C. Unresolved Issues of Fact
Respondent sets forth numerous items that she characterizes as "unresolved genuine issues of material fact". Because we reject respondent's primary legal argument, some of those items become immaterial. It is thus efficient for us to address respondent's unresolved issues of fact after addressing her legal argument, and we will do so. VI. Analysis *220 of Respondent's Legal Argument
A. Section 512(b)(2)
Respondent argues that, in using the term "royalties" in section 512(b)(2), Congress had in mind only "investment income", and intended the term "royalties" in that section to describe only income of that character. As authority for that proposition, respondent cites S. Rept. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 483, 506. In pertinent part, that report reads as follows: The tax on unrelated business income does not apply to dividends, interest, royalties, and rents * * * * * * Dividends, interest, royalties, most rents, capital gains and losses, and similar items are excluded from the base of the tax on unrelated income because your committee believes that they are "passive" in character and are not likely to result in serious competition for taxable businesses having similar income. Moreover, investment-producing incomes of these types have long been recognized as a proper source of revenue for educational and charitable organizations and trusts. [Id.; emphasis added.]
S. Rept. 2375 accompanied H.R. 8920, 81st Cong., 2d Sess. (1950), which became the Revenue Act *221 of 1950, ch. 994, 64 Stat. 906. Section 301(a) of the Revenue Act of 1950, 64 Stat. 947, added to the Internal Revenue Code of 1939 sections 421 through 424, provisions that, for the first time, imposed a tax on the unrelated business net income of certain otherwise tax-exempt organizations. Section 422 of the Internal Revenue Code of 1939 is the origin of section 512(b)(2). It is clear that, in enacting sections 421 through 424 of the 1939 Code, Congress primarily was concerned with what it viewed to be the problem of unfair competition between tax-exempt and taxable organizations. S. Rept. 2375, supra, 1950-2 C.B. at 504; H. Rept. 2319, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 380, 409; see United States v. American College of Physicians, 475 U.S. 834, 837-838 (1986). The reports of both the Committee on Ways and Means and the Committee on Finance speak in terms of imposing a tax on so much of the income of exempt organizations as arises from active business enterprises that are unrelated to the exempt purposes of the organization. H. Rept. 2319, supra, 1950-2 C.B. at 408; *222 S. Rept. 2375, supra, 1950-2 C.B. at 503, 504. Nevertheless, Congress did not, in just so many words, impose such a tax. What Congress did do, however, was exclude from the base of UBTI certain classes of income, including royalties. On the evidence of the committee reports, Congress believed such income to be passive in character. The report of the Committee on Ways and Means states: The tax applied to unrelated business income does not apply to dividends, interest, royalties (including, of course, overriding royalties), rents (other than certain rents on property acquired with borrowed funds), and gains from sales of leased property. Your committee believes that such "passive" income should not be taxed where it is used for exempt purposes because investments producing incomes of these types have long been recognized as proper for educational and charitable organizations. [H. Rept. 2319, supra, 1950-2 C.B. at 409; emphasis added.]
The report of the Committee on Finance is more emphatic: "your committee believes that they [dividends, interest, royalties, etc.] are 'passive' in character". S. Rept. *223 2375, supra, 1950-2 C.B. at 506 (more fully quoted above). The Committee on Finance also voiced its opinion that "investment-producing incomes of these types have long been [as set forth below] recognized as a proper source of revenue for [certain exempt organizations]". Id.
Such language concerning "investment-producing incomes" in the Committee on Finance report is the reed on which respondent rests her case. That language is, however, ambiguous. It is susceptible of two readings: (1) That royalties (and the other categories of income specifically set forth) intrinsically fail to encompass other than investment income, and (2) that an investment quality characterizes those royalties (and other items in the categories set forth) constituting the endowment of an educational or charitable organization or trust. The latter interpretation is at least as plausible as the former, and becomes superior when consideration is given to the comparable language in the report of the Committee on Ways and Means, where the word investment is used as a noun rather than an adjective ("investments producing incomes of these types [dividends, interest, *224 royalties, etc.] have long been recognized as proper for educational and charitable organizations" (emphasis added)). H. Rept. 2319, supra, 1950-2 C.B. at 409 (more fully quoted above). Moreover, the reports of both the Committee on Ways and Means and the Finance Committee contain sections entitled "Detailed Discussion of the Technical Provisions of the Bill". In each such section is a discussion of the tax to be imposed on the unrelated business income of certain exempt organizations. In virtually identical language, each report describes the exception for dividends, interest, royalties, and the like: All dividends, interest, annuities, and royalties, and the deductions directly connected therewith, are excluded from the concept of unrelated business net income. This exception applies not only to investment income, but also to such items as business interest on overdue open accounts receivables. * * * [S. Rept. 2375, supra, 1950-2 C.B. at 560; cf. H. Rept. 2139, supra, 1950-2 C.B. at 459; emphasis added.]
That language is evidence that neither the Committee on Finance *225 nor the Ways and Means Committee had in mind meanings for the terms "dividends", "interest", "annuities", and "royalties" that excluded in all cases income other than investment income. A fair view of Congress' intent in enacting section 422 of the 1939 Code, as expressed in both the report of the Committee on Finance and the report of the Committee on Ways and Means, is that Congress neither considered that royalties (or dividends, interest, and annuities) intrinsically failed to encompass other than investment income nor intended to use those terms in a restricted sense to describe only investment-restricted subclasses of such items. Accordingly, respondent's reliance on S. Rept 2375, supra, 1950-2 C.B. 483, 506, to add an "investment-only" gloss to the term royalties is misplaced. In DAV II, we made clear what we thought to be the correct definition of the term "royalty": "payments for the use of valuable intangible property rights". Id. at 70. We refused to exclude from that definition payments for the use of intangible property derived from the active conduct of a trade or business. Id. at 71-72, 75. We considered the intent of *226 Congress in enacting section 512(b)(2) and rejected respondent's argument that a "different and narrower" meaning of the term "royalty" was there intended. Id. at 71-72. We have again considered the intent of Congress in that respect. Nothing respondent here argues persuades us that our analysis in DAV II was flawed. Indeed, respondent here has merely redraped the argument she made in DAV II, arguing now that Congress used the term "royalties" in section 512(b)(2) as exclusive of all but "investment" income. We rejected that argument in DAV II, and we reject it here. [7]
*227 B. Section 513(h)
Finally, respondent points to the addition by Congress of subsection (h) to section 513 in 1986. Respondent argues that such addition is consistent with a belief by Congress that royalties of the type earned here and in DAV II are subject to the tax on UBTI. Disabled American Veterans v. Commissioner, 942 F.2d 309, 317 (6th Cir. 1991) (Martin, J., concurring). Among other things, section 513(h) exempts from taxation as UBTI certain amounts earned by certain tax-exempt organizations from any trade or business of exchanging or renting mailing lists. [8] Petitioner is not within the category of tax-exempt organizations described in section 513(h).
*228 Respondent does not ask us to read section 513(h) as an amendment to prior law, which amendment would sweep into the computation of UBTI all gross income resulting from the licensing of mailing lists, and then exclude certain specified receipts. Nor would we read section 513(h) as accomplishing that. Respondent does, however, ask us to draw from Congress' adding section 513(h) the inference that Congress always has viewed gross income from the licensing of mailing lists as constituting UBTI, absent an explicit exemption. That, however, is not a proper inference to be drawn from Congress' action in adding section 513(h). First, we do not believe that Congress, in enacting section 513(h), intended to express a view as to the prior state of the law. Indeed, the legislative history of section 513(h) indicates no greater concern on the part of Congress than with the impact of Disabled American Veterans v. United States, 227 Ct. Cl. 474, 650 F.2d 1178 (1981), on a certain narrow class of transactions. See H. Rept. 99-426 (1985), 1986-3 C.B. (Vol. 2) 1, 886-867; S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 1, 884-885; *229 H. Conf. Rept. 99-841 (1986), 1986-3 C.B. (Vol. 4) 1, 822. We think that the staff of the Joint Committee on Taxation was correct when, in its pamphlet, General Explanation of the Tax Reform Act of 1986, it stated: "No inference is intended as to whether or not revenues from mailing list activities other than those described in the provision * * * constitute unrelated business income." J. Comm. Print 1325 (1987).[9] Congress need not have believed that the United States Court of Claims was right for it to have wished to assure, by legislation, the nonapplication of a similar result in other cases. We believe that that is all that Congress intended. *230 Moreover, even if Congress, in enacting section 513(h), had intended to express a view as to the prior state of the law, that view would not merit deference. As the Supreme Court has cautioned, it is hazardous to infer the intent of an earlier Congress from a subsequent one. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 114 (1989); United States v. Price, 361 U.S. 304, 313 (1960). That admonition is particularly pertinent here, because section 513(h) was added more than 35 years after section 422 of the 1939 Code. We decline to draw any inference from the addition of section 513(h), and, on its terms, that section is inapplicable to this case. VII. Unresolved Issues of Material Fact
In connection with petitioner's motion for partial summary judgment, respondent was directed by the Court to include in any written response to petitioner's motion for partial summary judgment a short and concise statement of the material facts as to which respondent contends there exists a genuine issue to be tried. In respondent's memorandum, she sets forth facts relied on by petitioner with which she disagrees and *231 additional facts, which facts respondent claims must be established in petitioner's favor before summary judgment for petitioner may be granted. Such additional facts all relate to what respondent characterizes as the "correct legal test", viz, whether the mailing list income in question constitutes "investment" income. Our response to the questions of fact raised by respondent is as follows: A. Intangible Nature of Petitioners Mailing Lists
Respondent argues that a question of material fact exists as to whether petitioner's mailing lists constituted intangible personal property. In support of that argument, respondent refers to certain lettered paragraphs of the Crosby affidavit. Nothing in those lettered paragraphs concerning either Names in the News or Triplex appears to address (much less be essential to determining) the "intangible" nature of the lists. Similarly, nothing in the referenced paragraphs of the affidavit of Don Chilcutt (the Chilcutt affidavit) addresses the intangible nature of the lists. Such paragraphs address policies and practices connected with the rental of petitioner's lists. Likewise, nothing in the referenced paragraphs of the affidavit of *232 John Kehoe (the Kehoe affidavit) addresses the intangible nature of the lists. The affidavits provided by respondent fail to set forth specific facts showing that there is a genuine issue of fact for trial concerning the intangible nature of the lists. We conclude, therefore, that there is no such genuine issue of fact. See Rule 121(d). B. "Sale" of Copies of the Mailing Lists on Tapes or Labels
Respondent argues that a question of material fact exists that "petitioner was selling copies of portions of its mailing lists on computer tape and pre-printed labels directly to its customers." In support thereof, respondent refers to paragraph 13 of the Chilcutt affidavit, which reads as follows: When a mailing list was ordered by a mailer, Sierra Club made arrangements to have any special services performed (i.e., computer selections) and delivered the resulting mailing list to the customer on magnetic tape or on a variety of pre-printed labels, such as heat transfer, gummed, or Cheshire labels. The choice of format was the mailer's -- some preferred to receive the information on pre-printed labels ready to apply to materials to be mailed by the list user and some preferred *233 the information to be supplied on magnetic computer tape. In the later case, the computer tape would be used to "print" the names and addresses directly onto the material to be mailed (e.g., mail order catalogs).
The parties have stipulated that Chilcutt oversaw and administered the external uses of petitioner's list of catalog purchasers. Nevertheless, we think it a fair inference that lists of members, donors, and others were handled in the same way as petitioner's list of catalog purchasers. Respondent's allegation of the material question of fact in issue is somewhat confusing. The parties have stipulated that petitioner has exclusive ownership rights in its mailing lists and, during the years in issue, others were permitted to use such lists on a fee per individual transaction basis. We thus understand respondent's claim as to the material question of fact in issue to be that lists were provided to users either on magnetic tape or on a variety of pre-printed labels. Documents attached to the Chilcutt affidavit lead us to believe that a separate charge may have been made depending on how names were provided to a user (on tape or label). We think that respondent *234 has established genuine issues of fact as to the media used to supply mailing list names to users and the extent to which a fee was charged for a particular medium. Those issues bear on whether such fees, if any, are royalties. C. Payments for Services
Respondent argues that a question of material fact exists as to whether "Substantial services (e.g., computer services) were sold to petitioner's clients in connection with list rentals: there were standard charges for these services". In support thereof, respondent refers to paragraphs 12 and 13 of the Chilcutt affidavit. Paragraph 13 is set forth above; paragraph 12 reads as follows: List rental instructions were sent to Sierra Club, who had the list rental order filled through the computerhouse which maintains Sierra Club's mailing lists. These instructions included the mailer's requests for additional "computer selects." Additional charges were made for these optional computer services, (e.g., recent names may cost an additional $ 5.00/thousand or names selected by zip code may cost an additional $ 2.50/thousand). These charges were as shown on the List Rental Instructions in Ex. H.
Again, we will generalize *235 those statements, which pertain to petitioner's catalog lists, to the remainder of its mailing lists. We think that respondent has established a genuine issue of fact as to whether petitioner provided and charged for services in providing its mailing lists to users. D. Frequency of Rentals
Respondent states that she "disagrees with petitioner's statement that: 'At times, for one of a number of reasons, instead of engaging in a list exchange Sierra Club would, like DAV, provide names to a list user in exchange for a cash payment.'" "This", respondent claims, "is an inaccurate statement of the facts." It is stipulated that, during the years in issue (1) petitioner acquired names of prospective members and supporters through list exchanges with other organizations, (2) permitted other organizations to use its mailing lists on a one-time basis per transaction, and (3) charged a fee of users. Thus, we deduce that respondent's disagreement has to do with the frequency of petitioner's list transactions for cash. An attachment to the Chilcutt affidavit appears to establish frequent transactions with regard to the catalog list. We thus accept that frequency is an unresolved *236 matter with regard to the catalog list. We will generalize the same result with regard to the other lists. Nevertheless, since we attach no importance to the level of activity undertaken by petitioner in connection with list rentals (i.e., whether it is active or passive) or the investment quality of the income realized to petitioner from list rentals, there appears to be no significance to the frequency of list rentals. We thus conclude that there is no genuine issue of material fact to be tried in this respect. E. Meaning of the Term "Rental"
Respondent states that she "disagrees with petitioner's statement that use of the term 'list rental' has no factual or legal significance." It is unclear to the Court exactly what is the issue of fact that respondent believes ought to be tried. In its memorandum, petitioner concedes that, at times, it has used the term "rental" to describe transactions in which, in consideration for providing names from its mailing lists to others, it has received payments. Indeed, it had been stipulated that such transactions occurred. In its memorandum, petitioner states that such transactions are commonly referred to as "list rentals", but that *237 such terminology "has no factual or legal significance", and that petitioner does not concede that the income produced by such transactions constitutes "rents", so as to be classified under section 512(b)(3), rather than royalties within the meaning of section 512(b)(2). We conclude that, with regard to this issue, respondent has raised no issue of fact capable of being tried. [10]
F. Extent of Petitioner's Role
Respondent states that she "disagrees with petitioner's statement that: Sierra Club played only a de minimis role in this activity." Apparently, *238 the activity to which respondent is referring is the activity in issue here, in which petitioner was involved with Names in the News, Chilcutt, and Triplex, and, in consideration for providing names from its mailing lists to others, petitioner received payment. The sentence to which respondent objects is the topic sentence in the following paragraph: Sierra Club played only a de minimis role in this activity. It had the right to review requests to use the lists, and to approve the proposed mailing material and schedule. Stipulation P 18. The purpose of this review was to ensure that Sierra Club members did not receive mailings that were of poor quality or inconsistent with Sierra Club's goals and objectives. DAV also reserved the right to approve mailing dates and examine and approve proposed mailing pieces. DAV II at 66. Again like DAV, Sierra Club updated and maintained its lists on a regular basis and inserted "seed" names in its lists to protect against abuse and unauthorized use of its mailing lists. Stipulation P 15 and P 17.
The substance of the rights and actions set forth in that paragraph is stipulated, and we do not view respondent as challenging *239 any stipulated facts. By affidavit, respondent describes other tasks and actions (e.g., promotion and advertising) constituting part of the enterprise of exploiting petitioner's mailing list that respondent would attribute to petitioner. Indeed, it is stipulated that Names in the News and Chilcutt "oversaw and administered the external uses" of petitioner's various mailing lists and that Triplex maintained a computer data base of those lists and fulfilled orders for those lists. In DAV II, we used the term "de minimis" to characterize the quantum of services mixed into the package of value there provided to a list user: "In any event, the services that petitioner provided in conjunction with the list rental activities were de minimis." DAV II, 94 T.C. at 78 (alternatively stated in the same paragraph: "In this case, the income from the use of names from the donor list predominates, and any services were ancillary."). We did not require any allocation of income to services. Id.
Whether the quantum of services going into the mix in this case is sufficient to require an allocation of receipts is at least a mixed question of fact and law for the Court *240 to decide. See id. We already have determined that respondent has established a genuine issue of fact as to whether petitioner provided and charged for services in providing its mailing lists to users. We do not think that, with regard to the issue discussed in this section of the opinion, respondent has established any additional question of fact to be tried. G. Uniqueness
Respondent states that she "disagrees with petitioner's statement that its lists are unique." It is unclear exactly what respondent is getting at here. In its memorandum, in discussing the Congressional policy behind the UBTI provisions, petitioner states: here, as in DAV II, Sierra Club's mailing lists are unique intangible assets. Therefore, there is no competition with commercial entities. Cf. DAV II at 71. ("It is unclear what competition petitioner's donor list offers to commercial organizations. Like most other intangible assets, the donor list is unique.")
In support of her contention that there is a genuine issue to be tried, respondent states: "Petitioner's lists were offered in the usual marketplace for list rentals, using the usual technologies, offering the usual *241 range of services, and at the usual terms and rates as commercial lists." Portions of the affidavits submitted by respondent support her assertion that there is an active, commercial market for list rentals. We thus accept the existence of a commercial market for list rentals and the particulars of that market as unresolved matters. Nevertheless, since we attach no importance to the level of activity undertaken by petitioner in connection with list rentals (i.e., whether it is active or passive) or the investment quality of the income realized to petitioner from list rentals, there appears to be no significance to the character of the market. We thus conclude that there is no genuine issue of material fact to be tried in this regard. H. Competition
Respondent states that she "disagrees with petitioner's statement that: 'there is no competition with commercial entities.'" We believe that petitioner is making the same point here that she makes with regard to "uniqueness". Accordingly, we have the same response. I. "Investment Relationship" Respondent states: "Petitioner's relationship to the production of its income was not that of an investor. Petitioner directly *242 conducted its business through its agents." That proposed issue of fact apparently goes directly to respondent's "investment" theory. Having rejected that theory, we conclude that there is no genuine issue of material fact to be tried. J. Motivation
Respondent states: Petitioner's motivation for conducting this activity is also at issue: petitioner rented its lists with a profit motive, the conduct of the activity was "unrelated to petitioner's exempt purposes"; petitioner did not have "an investment motive" in conducting this activity. Because petitioner retained all usual business controls over the direct conduct of its list rental business, it did not have the requisite investment motive.
We distill from that catalog of assertions a complaint similar to that discussed in the immediately preceding section ("Investment Relationship"), and will treat it accordingly. K. "Preliminary Questions of Fact" Respondent states: "The three major factual issues to be addressed before reaching the final (but closely-related) royalty question are: 1) Was the petitioner engaged in a trade or business; 2) was the trade or business regularly carried on; and, 3) was *243 the trade or business unrelated to petitioner's exempt purpose?" Respondent further states that, unless conceded by petitioner, those questions present questions of fact to be tried. [11]
Petitioner relies on our opinion in DAV II, in which those issues were, in effect, conceded. Thus, for purposes of applying that case, with regard to petitioner's motion, we will likewise regard them as being conceded. VIII. Conclusions
A. Petitioner's Motion for Summary Judgment
1. Unresolved Issues of Material Fact
Given that we will hew to our decision in DAV II, the questions of fact that have been established by respondent, are material, and remain unsettled are as follows: a. The media used to supply mailing lists names to users and the extent to which a fee was charged for a particular medium; b. whether petitioner provided and charged for services in providing its mailing lists to users. 2. Legal Questions
*244 Respondent has failed to set forth specific facts showing that there is a genuine issue of fact for trial concerning the intangible nature of petitioner's mailing lists. The intangible nature of those mailing lists is not a material fact relied on by petitioner. Nevertheless, in DAV II, 94 T.C. at 70, we accepted the following as a definition of the term "royalties" for purposes of section 512(b)(2): "payments for the use of valuable intangible property rights". Whether valuable property rights constitute an intangible or not presents at least a mixed question of law and fact. Therefore, we will consider whether, from the record, we can hold that petitioner's mailing lists constitute intangible assets. It is stipulated that petitioner develops and maintains mailing lists composed of names, addresses and related information of its members, donors, catalog purchasers and other supporters, and that it has exclusive ownership rights in those mailing lists. Clearly, it is access to the information contained in those lists and the legal right to use that information that constitutes a significant portion of what customers are willing to pay for. Such access *245 and rights lack physical existence and are, thus, intrinsically, intangible. See Black's Law Dictionary (6th ed. 1990) ("Intangible value. Nonphysical value of such assets as patents, copyrights, goodwill."). [12] We thus hold that the mailing lists in question constitute intangible assets.
*246 It is stipulated that, during the years in issue, outsiders were permitted to use petitioner's mailing lists on a "one-time per transaction" basis, paying a fee as set forth in a rate schedule. Some or all of such fee was paid in consideration of the use of a valuable intangible asset, viz, petitioner's mailing lists. Respondent has raised genuine issues of material fact as to whether a portion of the fee charged by petitioner was in consideration of the physical medium in which the mailing lists were made available to the user or in consideration of services performed by petitioner for such users. Without a finding as to the portion of the fee so allocable, we cannot say how such portion must be treated (or what effect it would have on the whole). Cf. DAV II, 94 T.C. at 78 ("Had the services that were provided been predominant, our conclusion about the character of the income generated would change.") Accordingly, although we are prepared to agree with petitioner as to the primary legal issue here presented (the definition of the term "royalties" for purposes of section 512(b)(2)), we are restrained by certain unanswered factual questions to render *247 partial summary judgment of a more limited scope than requested by petitioner. We will thus grant petitioner's motion for partial summary judgment to the extent that the fee received by petitioner in consideration for making its mailing lists available on a "one-time per transaction" basis was not received in consideration of the physical medium in which the mailing lists were made available to the user or in consideration of services performed by petitioner for such users. Following a hearing to determine the necessary questions of fact, we will be able to make findings of fact that will serve as the basis for a further resolution of the "mailing-lists" issue. B. Respondent's Motion for Summary Judgment
Although we will grant petitioner's motion for partial summary judgment only to a limited degree, such action is inconsistent with the theory of respondent's motion for partial summary judgment. Therefore, we will deny respondent's motion for partial summary judgment. An appropriate order will be issued. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Sec. 512(b)(2)↩ provides: "There shall be excluded all royalties (including overriding royalties) whether measured by production or by gross or taxable income from the property, and all deductions directly connected with such income."
3. Our decision in Disabled American Veterans v. Commissioner, 94 T.C. 60 (1990) (DAV II), was reversed by the Court of Appeals for the Sixth Circuit, 942 F.2d 309 (1991), on the grounds that the taxpayer was collaterally estopped from relitigating in this Court the issue of whether moneys received by the taxpayer from the sale of donor lists were excludable from unrelated business taxable income as royalties where the Court of Claims, Disabled American Veterans v. United States, 227 Ct. Cl. 474, 650 F.2d 1178↩ (1981), had decided the issue adversely to the taxpayer for prior years.
4. National Collegiate Athletic Association v. Commissioner, 92 T.C. 456 (1989) (advertising revenues, not royalties), revd. on other grounds 914 F.2d 1417 (10th Cir. 1990); National Water Well Association Inc. v. Commissioner, 92 T.C. 75 (1989) (compensation for services, not royalties); Fraternal Order of Police v. Commissioner, 87 T.C. 747 (1986), affd. 833 F.2d 717↩ (7th Cir. 1987) (advertising revenues, not royalties).
5. Respondent's argument apparently concerns amounts received by petitioner in consideration of petitioner's making mailing lists available in a particular medium (e.g., magnetic tape) rather than that petitioner disposed altogether of its legal rights to use its own mailing lists. See the discussion infra↩ VII. B.
6. If we were to reconsider and adopt the active-passive distinction discussed in DAV II, respondent argues that petitioner's activities with regard to its list rentals were not passive. Since we do not adopt that test, we need not concern ourselves with that argument.↩
7. In passing, we note that it is unclear precisely what respondent means when she claims that, to qualify for sec. 512(b)(2), royalties (and the other classes of listed income) must constitute investment income. In respondent's memorandum, she phrases the question in the following less than illuminating manner: "In the instant case, the central * * * factual question is: did SC receive investment income from renting its mailing lists, or, was its income in the nature of gross receipts?" Respondent cites cases, Higgins v. Commissioner, 312 U.S. 212 (1941) and Whipple v. Commissioner, 373 U.S. 193, 201, 202 (1963), that would lead us to believe that she is establishing a dichotomy between investment income and income from a trade or business. Higgins v. Commissioner, supra (question of whether taxpayer's expenses incurred in connection with managing investments were incurred in carrying on a trade or business); Whipple v. Commissioner, supra at 202 (with regard to whether a bad debt is a business or nonbusiness bad debt: "When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business"). As we pointed out in DAV II, 94 T.C. 60, 76 (1990), unless royalties, in the first instance, are derived from a trade or business, they do not constitute a component of UBTI such that the modification made by sec. 512(b)(2)↩ would have any effect. On the whole, it seems to us that respondent's "investment" income restriction is nothing more than a reworking of the "active-passive" distinction rejected by us in DAV II and abandoned by respondent here.
8. In relevant part, sec. 513(h) states as follows: (1) IN GENERAL. -- In the case of an organization which is described in section 501 and contributions to which are deductible under paragraph (2) or (3) of section 170(c), the term "unrelated trade or business" does not include -- * * * (B) any trade or business which consists of -- (i) exchanging with another such organization, names and addresses of donors to (or members of) such organization, or (ii) renting such names and addresses to another such organization.
Enacted as sec. 1601(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2766, sec. 513(h)↩ is effective for exchanges and rentals of member lists after Oct. 22, 1986.
9. The same sentiment is expressed in a colloquy on the floor of the House of Representatives between Congressmen Rostenkowski and Duncan, which occurred on the day that the Conference bill adding section 513(h) was passed: I also have discussed with Congressman Duncan the issue of whether the provision of the bill which excludes certain income from unrelated trade or business income creates any inference under present law. We have reached a common understanding regarding the following specific issue: The question relates to section 1601 of the bill which excludes from unrelated trade or business income revenues from the use of a tax-exempt organization's mailing list by another such organization. Section 1601 of the bill, which specifically exempts certain such revenues from the tax on unrelated business income in the future, carries no inference whatever that mailing list revenues beyond its scope or prior to its effective date should be considered taxable to an exempt organization.↩
132 Cong. Rec. H8361 (Sept. 25, 1986).
10. In passing, we note that attached to the Kehoe affidavit submitted by respondent is Kehoe's "Expert Witness Report", which has attached to it a "glossary for definitions of terms used in this report and in the direct marketing business generally." That glossary defines the term "list rental" as follows: An arrangement in which a mailer obtains the right to mail the list owned by another on a one-time basis at an agreed upon cost per thousand names.↩
11. We assume that the concessions would be in the affirmative to each of the questions.↩
12. See generally Texas Instruments, Inc. v. United States, 551 F.2d 599, 609 (5th Cir. 1977) (" property is intangible if its intrinsic value is attributable to its intangible elements rather than to any of its specific tangible embodiments"); Ronnen v. Commissioner, 90 T.C. 74, 96 (1988) (citing sec. 1.48-1(f), Income Tax Regs., defining intangible property as "property such as patents, copyrights and subscription lists"); Sundstrand Corp. v. Commissioner, 96 T.C. 226, 380 (1991) (citing sec. 1.482-2(d)(3)(ii)(a), (c), (d), (e), Income Tax Regs.↩, "Intangible property is defined to include patents, inventions, * * * customer lists, and technical data").